

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-76,669

### EX PARTE ROSA ESTELA OLVERA JIMENEZ, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. D-1-DC-04-904165 IN THE 299TH DISTRICT COURT
### TRAVIS COUNTY

**COCHRAN, J., delivered the opinion of the Court in which KELLER, P.J., and PRICE, WOMACK, JOHNSON, KEASLER, HERVEY, and ALCALA, JJ., joined. MEYERS, J., did not participate.**

This is a tragic case involving the death of a toddler who choked on a wad of paper towels while applicant was babysitting him. The question at trial was whether the child stuffed the towels down his own throat and died accidentally or whether applicant forced the towels into his mouth and caused his death.

A jury convicted applicant of felony murder and injury to a child and sentenced her to 75 years in prison for the murder and 99 years in prison for the injury to a child. The court

of appeals affirmed applicant's convictions,[1] and we denied applicant's petition for discretionary review. Applicant then filed an application for a writ of habeas corpus and, after conducting extensive hearings, the habeas judge recommended that we grant applicant a new trial.[2] The habeas judge concluded that (1) applicant's due process rights under *Ake v. Oklahoma*[3] were violated because she was denied adequate funding to hire experts, and (2) trial counsel was ineffective because he failed to (a) retain qualified experts, (b) make a written request for such experts, and (c) object and request a mistrial and a continuance in response to his own expert's testimony. Although we agree with some of the habeas judge's factual findings, we do not adopt them all because some of them are not supported by both the trial and habeas records. As the ultimate fact finder, we will "exercise our authority to make contrary or alternative findings and conclusions" when necessary.[4] After reviewing all of the evidence, we find that applicant has failed to show that she is entitled to a new trial. Therefore, we deny relief.

## I.

**A.    Background.**

According to applicant, she was babysitting 21-month-old B.G. when she saw him

---

[1] *Jimenez v. State*, 240 S.W.3d 384 (Tex. App.–Austin 2007, pet. ref'd).

[2] The habeas judge was not the judge at the original trial.

[3] 470 U.S. 68 (1985).

[4] *Ex parte Reed,* 271 S.W.3d 698, 727-28 (Tex. Crim. App. 2008).

walking toward her and noticed that he was "limp and purple."  After a neighbor called 911,

paramedics arrived and extracted a "large mass" of "blood soaked" paper towels stuffed into

B.G.'s throat.  B.G. died three months later from brain damage due to the prolonged lack of

oxygen during the choking.  The court of appeals's opinion described the trial testimony in

detail and summarized the theories of both the defense and the State:

> Jimenez's theory was that the entire incident was an accident.  B.G. liked to play with paper towels and put things in his mouth.  On the day in question, he put the paper towels in his mouth and accidentally swallowed them.  Jimenez discovered B.G. choking, tried to help him in the bathroom (thus explaining the blood found there), and when she was unable to do so, immediately carried him to her neighbor's apartment.  Jimenez found support in the fact that witnesses who had tried to look inside B.G.'s mouth had been unable to do so because B.G. kept biting their fingers.  That would have been impossible, according to Jimenez, if B.G.'s airway had been occluded for a long period of time.  The defense also portrayed Jimenez as a young pregnant woman who would not have been physically able to commit the crime of which she was accused.  Additionally, the defense claimed that Jimenez's various explanations of the incident were largely consistent, and that any minor inconsistencies were the result of the trauma that she had just experienced and the fact that she did not have a proper understanding of the English language.  Her possibly incriminating statements to Officer De Los Santos were also attributed to trauma and De Los Santos's aggressive questioning.  Jimenez also argued that the State's medical experts were biased in the State's favor because of the emotional nature of the case.  Finally, Jimenez argued that her expert, Dr. Kanfer, provided testimony that the blood on the paper towels was primarily the result of pulmonary edema and that if the paper towels had been forced down B.G.'s throat, there should have been evidence of injury to the child's face or mouth and evidence that the paper towels had been shredded by the child's teeth.

> The State's theory was that Jimenez had forced the wad of paper towels down B.G.'s throat.  The blood found on the paper towels and in Jimenez's bathroom, in the State's view, was evidence of force, not an accidental choking.  The State's medical experts had testified that it was physically impossible for a 21–month–old child to place five paper towels down his

throat, and that the child's gag reflex would prevent the child from accidentally swallowing such a large object. Furthermore, the State argued that Jimenez provided inconsistent explanations of how she found the child and that her statements to Officer De Los Santos were incriminating. Additionally, the State referred to photographic evidence of what appeared to be bite marks on Jimenez's hand and Jimenez's admission to Officer De Los Santos that B.G. bit her. Based on this evidence, the State argued, "Folks, we don't need a forensic odontologist to tell you what this is on her hand."[5]

The resolution of this case depended primarily on expert testimony[6] concerning whether B.G. could have stuffed the five wadded-up, double-ply paper towels into his mouth by himself and accidentally choked on them or whether that was "physically impossible," in which case applicant must have forced the wad down his throat.

**B.     The Trial Testimony Concerning "Accident" or "Homicide."**

At trial, Dr. John Boulet testified that he was a board-certified pediatric emergency physician who first treated B.G. at the hospital. He stated that he saw the wad of paper towels that had been removed from B.G.'s throat, and that it was nearly the size of his own fist.[7] In his opinion, an object of that size could not go down a child's airway accidentally;

---

[5] *Jimenez,* 240 S.W.3d at 397-98.

[6] The State also relied on applicant's "private" talk with Officer De Los Santos in which she asked if she could speak with him "as a friend" outside the police station. Unbeknownst to applicant, the officer recorded this conversation in which applicant asked, "If I were to tell you that I did it, what would happen?" She also asked the officer about how long she could go to prison, to which Officer De Los Santos replied that he did not know.

[7] The paramedic who had removed the "wad" after several unsuccessful attempts, stated that, in a photograph taken about an hour and a half later, the wad appeared to have dried out a little and expanded. At the time he pulled it out of B.G.'s throat, it was the size of a large egg, about 3 inches long and close to 3 inches wide. The paramedics immediately "bagged" the wad and gave it to police because they suspected that it was evidence of a potential crime.

"it would have to be put down there."

Dr. Patricia Oehring testified that she is a pediatric critical-care physician. She was B.G.'s primary doctor once he was moved from the emergency room to the intensive care unit. When shown a photograph of the wad of paper towels, she said that it was not possible for B.G. to put this wad down his throat all by himself. Although toddlers "definitely" put things that look like candy or food into their mouths, "[i]f it doesn't taste good or have an interesting texture, they're not going to leave it in their mouths. They're not going to shove it to the back of their mouth." She stated that slippery items–like buttons or coins–might slide down their throats, but that "children don't suck on paper towels."

She concluded that B.G.'s gag reflex would have prevented him from forcing a large object down his throat: "[H]e'll gag as soon as you hit the soft palate" and the gag reflex operates all the way down the airway. In her opinion, an adult forced the paper towels into B.G.'s throat: "He'd have to be held down. . . . [H]e would have been coughing and gagging and bleeding and fighting and struggling up to the point where his brain didn't get enough oxygen to where he became limp."[8]

Finally, Dr. Oehring said that a child of B.G.'s age would not have the strength or dexterity to "wad" the paper towels together into a small ball. She thought that the wad must

---

[8] The defense argued that this scenario could not be accurate because B.G. had no other injuries, bruises, or scrapes on his body, and applicant had only a small bite mark on her hand where B.G. had bitten her as she tried to pull the wad out of his mouth when she first saw his distressed breathing.

have been soaked in "water or something" before being put into his mouth.[9]

Dr. Elizabeth Peacock, a forensic pathologist and deputy medical examiner,[10] testified that B.G.'s death was a homicide caused by damage to the brain from a lack of oxygen. This finding was "not a close call" because "the physics of it [being an accidental death] are impossible." She explained that the back of the throat of a 21-month-old child is small, less than an inch in diameter. "The only things that can really get down there and obstruct, in my opinion, and in the . . . forensic texts are something that's round or small to that degree."

The defense expert, Dr. Ira Kanfer, is a forensic pathologist and medical examiner. In his opinion, B.G.'s choking was accidental. He believed that B.G. would have been able to wad up the paper towels himself, stuff them into his mouth, and accidentally swallow them. He explained that he had conducted an experiment to test this theory by wadding up

---

[9] A roll of paper towels was found on the sofa in applicant's living room. Applicant told the police that both B.G. and her daughter had runny noses that day. She used a paper towel to wipe B.G.'s nose, then left the roll on the sofa, and went into the kitchen to cook. She noticed that both B.G. and her daughter were playing with the paper towels, tearing sheets from the roll and throwing them. She told the children to stop playing with the towels, but they continued to do so. She saw B.G. go into the bedroom, leaving the roll of towels on the sofa. Applicant called to B.G. to come back where she could see him because she did not want him playing in the bathroom and putting his hands in the toilet bowl. When B.G. came toward her, he was "walking very slowly" with his hand on his throat. He was very red, but when she asked him what was wrong, he did not answer. She saw him choking on something, so she took him into the bathroom, squeezed his cheeks together, tried to put her fingers in his mouth to see what was wrong, and hit him on the back in an effort to dislodge the obstruction. When she could not get the object out of his mouth, she picked him up and ran over to her neighbor's house for help. She said that only a minute or two had elapsed from the time she first saw B.G. choking until she took him to the neighbor's apartment.

[10] Dr. Peacock did not perform B.G.'s autopsy; she reviewed the autopsy report written by Dr. Vladimir Parungao. The defense called Dr. Parungao in its case to impeach his credibility and attack his autopsy finding that B.G.'s death was a "homicide."

five paper towels, soaking them in water, and compressing them into a ball small enough to fit into a toddler's mouth and throat.

Dr. Kanfer explained that, if someone had forced five paper towels down B.G.'s throat, there should have been some evidence of trauma "around the cheeks, the lips, the teeth, [or] a cut gum" because "[t]he child's going to fight like hell. There's going to be bruises. There's going to be tears."[11] Furthermore, B.G.'s teeth would have ripped the paper towels to shreds as someone tried to force them past his teeth. Dr. Kanfer said that the absence of any evidence of bruising and shredded towels was "crucial" to the investigation and expert conclusions.

Dr. Kanfer also thought that the blood found on the towels was consistent with pulmonary edema, a reaction that can occur when a person is choking, where blood flows into the air sacs in the lungs. He stated that the results of B.G.'s chest x-ray taken several days after the incident were consistent with pulmonary edema.[12]

Dr. Kanfer also disagreed with the State's theory that B.G. had stopped breathing by

---

[11] Dr. Kanfer also noted that, because applicant was seven months pregnant, she would likely have a difficult time holding a toddler tight enough to force the wad down his throat. Dr. Oehring, on the other hand, had testified that doctors routinely restrain small children in the ICU without bruising their patients and that she had seen many children who were murdered without any bruises being left on the skin.

[12] Dr. Oehring had previously testified that B.G. did not have pulmonary edema, and Dr. Boulet had said that he did not think that the blood on the towel wad was consistent with pulmonary edema. The State's theory was that the blood on the towels resulted from applicant's act of forcing the wad down B.G.'s throat, while the defense theory was that the blood resulted from pulmonary edema regardless of how the towels came to be lodged in B.G.'s throat.

the time of the 911 call.  In his opinion, B.G. was experiencing "agonal" breathing, a result of severe oxygen deprivation.  He said that when a person's airway is completely blocked, the heart cannot continue to beat for more than four to five minutes and that, after the heart stops, all "purposeful movement" lasts only a minute or two longer.  Thus, B.G. would not have been able to bite the neighbor's or the paramedic's fingers when they tried to open his mouth if the choking occurred earlier than the time applicant said.[13]

Finally, Dr. Kanfer suggested that the various attempts to resuscitate B.G. by applicant, the neighbor, and the paramedic may have driven the wad farther down his throat and accidentally made the obstruction worse.

The defense also called Dr. Randall Alexander, a board-certified pediatrician, as a hostile witness.  Dr. Alexander agreed with Dr. Kanfer that, if a child's airway is completely occluded, his heart would not continue to beat for an hour, and that pulmonary edema might (or might not) occur when one's airway is blocked.  However, on cross-examination, Dr. Alexander largely agreed with the testimony of the treating doctors.[14]

---

[13] Applicant told police that she scooped up B.G. and ran to the neighbor's within a minute or two of seeing him choking.  The State's theory was that she did not take B.G. over to the neighbors for "probably 30 to 40 minutes" after he had been deprived of oxygen.

[14] After Dr. Alexander's testimony, the defense recalled Dr. Kanfer to further explain his views.  However, this proved to be counterproductive.  As the court of appeals stated, "[a]t some point during a break in Dr. Kanfer's testimony and outside the presence of the jury, Dr. Kanfer apparently made a rather contemptuous comment about the prosecutors, which included the use of a profane verb." *Jimenez*, 240 S.W.3d at 403.  During her second cross-examination of Dr. Kanfer, the prosecutor brought this incident to the jury's attention three different times:

Q:     And you're just here as a completely unbiased expert to educate the jury.

A:     Exactly.

The jury was presented with two possible, but conflicting, theories concerning B.G.'s death. There was medical evidence to support either possibility: intentional homicide or self-inflicted accidental death. The jury found applicant guilty, rejecting the defense theory of an accidental death. The court of appeals reviewed all of the evidence on appeal and held that, viewing that evidence in the light most favorable to the verdict, "a rational jury could

---

Q:    Is that why on the break you made the statement that they, referring to Mr. Cobb and myself, could go [expletive] ourselves?

A:    Right. That's an exactly correct quote.

Later, the State asked,

Q:    Do you remember that you made the statement that Mr. Cobb and I could [expletive] ourselves before I ever asked you about money? Do you remember that?

A:    I don't know when I made the statement that—that you could both [expletive] yourselves, but I definitely made the statement.

Q:    Okay. Yeah, you definitely did.

A:    Yeah.

Q:    Is that something that you routinely do when you go out of state to testify as an expert witness?

Defense counsel then objected to the State "getting into the personal thing any more." The prosecutor responded that the question was relevant to the issue of Dr. Kanfer's bias, and the trial judge overruled the objection. At the end of her cross-examination, after the prosecutor asked about Dr. Kanfer's disagreement with Dr. Alexander's opinions, the prosecutor said,

Q:    But you're not angry at Dr. Alexander.

A:    No, he's a nice guy.

Q:    Okay. Well, then you don't want to tell him to go [expletive] himself.

A:    No.

The court of appeals concluded that the trial judge did not err in permitting this cross-examination because "Dr. Kanfer's admitted use of profanity when referring to the prosecutors revealed potential animosity toward the prosecutors." 240 S.W.3d at 403.

have found that [applicant] forced the wad of paper towels down B.G.'s throat."[15]

C.     **The Testimony at the Habeas Hearing Concerning "Accident" or "Homicide."**

After the court of appeals affirmed her conviction, applicant filed an application for a writ of habeas corpus, claiming, among other things, "actual innocence" based on additional expert evidence that B.G. could have, and most likely did, put the wad of paper towels into his mouth and then accidentally choke on them. During the habeas proceedings, applicant presented the live testimony of two pediatric specialists from the Children's Hospital of Philadelphia, Dr. Karen Zur, a pediatric otolaryngologist, and Dr. John McCloskey, a pediatric anesthesiologist and critical-care specialist. She also submitted an affidavit from Dr. Janice Ophoven, a pediatric forensic pathologist. These were all highly qualified experts who based their opinions upon a scientific methodology, and their opinions were supported by scientific data as well as familiarity with the facts of this case.

They, like Dr. Kanfer, questioned the reliability of the conclusions offered by the two doctors who had cared for B.G., Dr. Alexander (whom applicant had called as a hostile witness) and the two medical examiners who had testified at trial. These new experts, like Dr. Kanfer, testified that B.G.'s injury was likely due to an accidental choking. Their credentials were even more impressive than those of Dr. Kanfer and their examples even more vivid and detailed than his. They, like Dr. Kanfer, presented an eminently plausible theory of how B.G. could have accidentally choked on a wet wad of paper towels.

---

[15] *Jimenez*, 240 S.W.3d at 401-02.

The habeas judge made detailed factual findings concerning these three experts, their credentials, their opinions, and the factual bases for their opinions.[16] He found the three new defense experts credible and reliable, and he determined that the State's experts did not rebut their conclusions. But he also concluded that their opinions were not "newly discovered" or sufficient to show that applicant was "actually innocent."[17] Furthermore, neither the habeas judge nor applicant pointed to any significantly "new"[18] or materially "different" expert

---

[16] The habeas judge's extensive factual findings concerning Drs. Zur, McCloskey, and Ophoven and their opinions take up six single-spaced pages. Those findings are based upon the habeas record, and we agree with their overall accuracy.

[17] The habeas judge concluded, in pertinent part,

3.  The opinions of medical experts who have reviewed materials available at the time of trial are not newly discovered evidence of the type that is sufficient to support an actual innocence claim. *Ex parte Briggs*, 187 S.W.3d 458, 465 (Tex. Crim. App. 2005).

4.  The expert opinions produced by Applicant do not constitute newly discovered evidence under actual innocence jurisprudence because they rely on the same evidence as that available at the time of trial. Applicant's experts have merely presented a differing interpretation of the physical and medical evidence that existed at the time of trial.

5.  Even if the opinions of Applicant's three experts had been sufficient to qualify as newly discovered evidence, the applicant has not met her burden. Having examined the habeas evidence against the trial evidence of guilt, this court finds Applicant has not shown by clear and convincing evidence that no reasonable juror would have convicted her in light of the habeas evidence. The evidence presented by the applicant's three experts is not medically indisputable, but rather offers a differing view of the medical evidence from that presented by the State.

[18] These experts provided additional anecdotal evidence about other children who had accidentally swallowed or choked on foreign objects, including a large wad of bread and a "super ball." Dr. McCloskey "also testified that he did not find the inconsistencies in applicant's statements regarding the injury to be evidence of child abuse. He testified that he has received training in taking such histories and that a police officer would not have the level of training needed to obtain a reliable medical history." Dr. Ophoven's affidavit stated that, based on her experience in evaluating child abuse cases, she found "no relevant indicators of child abuse" because B.G. had no "suspicious injuries" on his throat, mouth, or face, which he would have had if someone had stuffed a wad of paper down his throat. She, like Dr. McCloskey, did not find that the variations in applicant's statements indicated child abuse, but rather were "entirely

opinions than those expressed by Dr. Kanfer at trial, although the new experts may have been even more highly qualified than Dr. Kanfer to express opinions on some specific aspects of this case.[19]  Some of the original witnesses from the trial also testified during the habeas hearing, including the EMT who removed the wad of towels from B.G.'s throat, Dr. Oehring (now known as Dr. Aldridge), the treating pediatric critical-care doctor, and Dr. Peacock, the forensic pathologist.  Dr. Alexander–the consulting pediatrician–submitted an affidavit. They all reaffirmed their trial testimony.  The State also called Dr. James Eskew, an otolaryngologist like Dr. Zur, who stated that he did not believe that B.G. accidentally choked on the wad of paper towels.  He, like Drs. Boulet, Oehring, Peacock, Parangao, and Alexander, did not believe it likely that a child could wad up paper towels of this size and put that wad down his throat.

Although the habeas judge concluded that the State's witnesses at the habeas hearing, did not "credibly rebut[] the testimony of applicant's experts that B.G. likely choked accidentally on the wad of paper towels," he acknowledged, in his legal conclusions, that the

_____

understandable in light of the crisis in which it was given, and the absence of any other indication of child abuse."

[19] For example, the habeas judge found that "Dr. Zur's credentials demonstrated that she is one of the most qualified persons in the nation to give an opinion on this case.  She was extremely well versed in the anatomy and mechanism[s] of choking, and based her opinions on this superior knowledge, training, and a complete review of all of the relevant medical information in the case."  He found that "Dr. McCloskey's credentials as [a] researcher and clinician who is board certified in pediatrics, anesthesiology, and pediatric critical care as well as his first-hand experience in treating both accidental choking cases and similar instances of child abuse give him a unique perspective on the evidence that lends additional credibility to his opinions regarding this injury."

credibility of dueling experts is for the jury to decide. Thus applicant failed to show, by clear and convincing evidence, that she was actually innocent of murder or injury to a child. As the United States Supreme Court recently noted, in the context of upholding the sufficiency of the evidence in a "shaken baby" homicide case, "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold."[20] We, like the court of appeals and the habeas judge, are legally constrained to uphold the jury's verdict in this case. We therefore adopt the habeas judge's recommendation and deny relief on applicant's "actual innocence" claim.

We requested additional briefing on two of applicant's claims, one based on *Ake v. Oklahoma,* the other on ineffective assistance of counsel. We turn now to those claims.

## II.

Applicant contends that she was denied due process and the effective assistance of counsel because the trial judge denied her the necessary funds for expert assistance as guaranteed under *Ake v. Oklahoma*.[21] In this case, applicant requested, and was given, funds for the appointment of two experts, but she asserts that she should have had additional expert assistance, including an expert on choking such as a pediatric otolaryngologist, to "level the playing field" with the State's experts.

---

[20] *Cavazos v. Smith*, 132 S.Ct. 2, 4 (2011).

[21] 470 U.S. 68 (1985).

**A.     The Constitutional Right of an Indigent Defendant to Expert Assistance at Trial**.

In *Ake*, the United States Supreme Court held that due process may require that an indigent defendant be granted access to expert assistance if "the expert can provide assistance which is 'likely to be a significant factor' at trial."[22]   Three interests must be balanced in determining whether the State must provide such access:

> The first is the private interest that will be affected by the action of the State.
> The second is the governmental interest that will be affected if the safeguard is to be provided.  The third is the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided.[23]

This analysis is conducted with a view towards whether failing to provide the defendant with the expert help he claims is necessary creates "a high risk of an inaccurate verdict."[24]

However, the State need not "purchase for an indigent defendant all the assistance that his wealthier counterparts might buy."[25]  Nor is a defendant entitled to choose an expert of his own personal liking or one who will agree with his defense theory.[26]  A defendant does not have a due-process right to "'shop' for experts–at government expense–until he unearths

---

[22] *Id.* at 74; *see also Taylor v. State*, 939 S.W.2d 148, 152 (Tex. Crim. App. 1996).

[23]  470 U.S. at 77.

[24] *Busby v. State*, 990 S.W.2d 263, 271 (Tex. Crim. App. 1999) (per curiam).

[25] *Ake,* 470 U.S. at 77.

[26] *Griffith v. State*, 983 S.W.2d 282, 286 (Tex. Crim. App. 1998) (noting that "the purpose of the appointment is to level the playing field; to give a defendant access to a competent expert who can assist in the evaluation, preparation, and presentation of the defense.").

a person who supports his theory of the case."[27]   But if the defendant makes a sufficient threshold showing of the need for expert assistance on a particular issue, the defendant is entitled to access to at least one expert,[28] who, even if he cannot or will not testify to the defense's theory of the case, is "available to consult with counsel, to interpret records, to prepare counsel to cross-examine State's witnesses, and generally to help present appellant's defense in the best light."[29]   The question in each case is "how important the scientific issue is in the case, and how much help a defense expert could have given. . . . The nature of an expert's field and the importance and complexity of the issue will bear directly upon whether the appointment of an expert will be helpful."[30]

If the trial judge appoints an expert, and the defendant requests another or a different expert, the trial judge may deny further expert assistance unless the defendant proves that the original appointed expert could not adequately assist the defendant.[31]   The Constitution does

---

[27] *Taylor*, 939 S.W.2d at 152.

[28] *Id.*

[29] *DeFreece v. State*, 848 S.W.2d 150, 161 n.7 (Tex. Crim. App. 1993).

[30] *Rey v. State*, 897 S.W.2d 333, 338 (Tex. Crim. App. 1995) (citation and internal quotation marks omitted).

[31]  *Busby*, 990 S.W.2d at 271 (trial judge did not commit *Ake* error by failing to appoint drug-abuse expert when psychiatrist had been appointed and trial court "could have reasonably found that [the psychiatrist] could adequately assist [the defendant] as a drug abuse expert with regard to those issues [raised by the defendant]"); *Richards v. State*, 932 S.W.2d 213, 215 (Tex. App. —El Paso 1996, pet. ref'd) (*Ake* was not violated when trial judge appointed a Texas psychologist rather than a California expert on post-traumatic stress disorder who "may have had more impressive credentials" because the defendant failed to prove that the expert appointed was incompetent to assist defendant on his PTSD-based defense).

not entitle "a defendant to the best (or most expensive) expert, or to more than one expert if the first does not reach a conclusion favorable to the defense. Just as a defendant who relies on counsel at public expense must accept a competent lawyer, rather than Clarence Darrow, so a defendant who relies on public funds for expert assistance must be satisfied with a competent expert."[32]

The Supreme Court has stated that an indigent defendant is not entitled to the appointment of experts when he offers "little more than undeveloped assertions that the requested assistance would be beneficial."[33] He must provide concrete reasons for requiring the appointment of any particular expert[34] As Professor LaFave notes,

> Courts uniformly stress that the showing of need must set forth in detail what assistance is being requested and why it is needed. The defense must identify the expert, explain what the expert will do, and explain why that will be important in representing the defendant.[35]

Thus, courts have held that a trial judge does not err in denying funds for an appointed expert

---

[32] *United States v. Mikos*, 539 F.3d 706, 712 (7th Cir. 2008) ("Abstract propositions about entitlement to expert assistance go nowhere when the defendant *had* an expert," especially when defendant failed to tell trial judge what a new expert could have done that original expert was unable to do); *see also Moore v. State*, 889 A.2d 325, 339 (Md. 2005) ("It is clear that *Ake* does not mandate handing over the State's checkbook to indigent defendants and their attorneys. The Supreme Court reiterated that it has never 'held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy,' but had rather 'focused on identifying the basic tools of an adequate defense or appeal.'") (quoting *Ake*; some internal quotation marks omitted).

[33] *Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985).

[34] *See, e.g., Hansen v. State*, 592 So.2d 114, 125 (Miss. 1991) (citing *Ake*).

[35] 3 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 11.2(e) at 654 (3d ed. 2007).

if the defense fails to set out the name of the requested expert in his motion, why the expert

is necessary in the particular case, and the approximate cost of appointing that expert.[36]

Article 26.052(f) and (g)[37] speak to this specificity requirement in the context of advance

funding for appointed counsel for investigation of potential defenses in capital cases, but

---

[36] *See, e.g., Johnson v. State*, 529 So.2d 577, 591 (Miss. 1988) (noting "certain requirements of specificity in the [*Ake*] motion . . . such as the name and specific cost for the expert and the purpose and value of such an individual to the defense.").  In *State ex rel. Dressler v. Circuit Court for Racine County*, 472 N.W.2d 532 (Wis. Ct. App. 1991) (defendant failed to make necessary showing of particularized need in his written requests for funding for expert assistance), the Wisconsin court of appeals set forth a suggested process for an indigent defendant's showing of particularized need for an appointed expert:

> (1) Defendant shall make an *ex parte* application to the trial court for expert assistance[;]
> (2) The application is reviewed *in camera* and sealed until resolution of the pending charges[;]
> (3) The application contain a sufficiently plausible explanation showing:
>> (a) The requested expert will assist the defendant in the preparation of his or her defense[;]
>> (b) The materiality of the expert–material evidence is that evidence which necessarily enters into the consideration of the controversy, and which by itself or in connection with other evidence is determinative of the case[;]
>> (c) The expert is not cumulative to other readily available witnesses[;] and,
>> (d) The expert is favorable to the defense.

*Id.* at 540 n.12.   This procedure is similar to that used in Texas courts.  See note 37 *infra*.

[37] TEX. CODE CRIM. PROC. art. 26.052(f) & (g).  Paragraph (f) reads: "Appointed counsel may file with the trial court a pretrial ex parte confidential request for advance payment of expenses to investigate potential defenses. The request for expenses must state:

> (1) the type of investigation to be conducted;
> (2) specific facts that suggest the investigation will result in admissible evidence; and
> (3) an itemized list of anticipated expenses for each investigation."

Paragraph (g) reads: "The court shall grant the request for advance payment of expenses in whole or in part if the request is reasonable. If the court denies in whole or in part the request for expenses, the court shall:

> (1) state the reasons for the denial in writing;
> (2) attach the denial to the confidential request; and
> (3) submit the request and denial as a sealed exhibit to the record."

there is no separate statute for noncapital cases.

**B.      Factual Background to Applicant's *Ake* Claim.**

In his first habeas affidavit, applicant's lead trial counsel explained the composition of the defense team as consisting of himself; second-chair counsel; a third counsel who joined the team shortly before trial; the defense investigator and his assistant; Dr. Ira Kanfer; Dr. George Parker, a psychologist; and Keith Kristelis, another expert who was experienced in graphics and simulation.  Counsel explained that he "would have liked to have been able to afford Dr. McGeorge,[38] [as well as] experts in biomechanical engineering, human factors research, and child development, but the willingness of people contacted to take appointed cases and the fee in the tens of thousands of dollars were beyond our limited resources." There is nothing in trial counsel's first affidavit that suggests that he had requested further monetary assistance from Judge Wisser, the trial judge, or that the judge denied any such request.

The trial record does show that applicant's trial counsel was able to obtain monetary assistance from the trial judge when he filed written motions requesting such assistance.  On June 13, 2003–six months after applicant's arrest–Judge Wisser granted applicant funds for the appointment of an investigator.  He granted additional investigative funds on October 1, 2004.  On January 16, 2004, Judge Wisser, "after considering the evidence and argument of

---

[38] Counsel stated that he had consulted Dr. McGeorge who had appeared on "Good Morning America" to talk about unusual children's choking accidents, including one child who swallowed a table fork.

counsel," signed an order approving funds for applicant to retain an expert in forensic medicine. Several months later, trial counsel wrote a letter to the prosecutor informing her that he had retained Dr. Kanfer whom he had found "through Dr. Henry Lee (of the O.J. case). . . . He is a forensic pathologist. He was the expert in the Boston Nanny case.[39] . . . Dr. Kanfer is even willing for you to depose him, assuming that Judge Wisser will allow him to be paid for it. . . . We have a tragic accident and I think that Dr. Kanfer might be able to shed some light." A few days before trial, Judge Wisser signed another order, granting applicant's "Sealed Ex parte Motion for Approval of Expert Witness," approving funds for "Keith Kritselis of Ichabod.com for simulation, animation, and demonstrative evidence." There is nothing in the trial record that shows that the trial judge denied any *Ake* motions or other requests for monetary assistance to retain experts.[40]

Applicant's initial habeas application did not contain any *Ake* claim. It was only when she filed a supplement to that application that she raised an *Ake* claim and attached a new affidavit from trial counsel in which he stated,

During my pre-trial preparations, I met with Judge [Wisser] to ask for

---

[39] The "Boston Nanny" case involved a young English au pair who was convicted of "shaken baby" manslaughter in the death of an eight-month-old child she was babysitting. *See* http://en.wikipedia.org/wiki/Louise_Woodward_case.

[40] The State attached an affidavit from Judge Wisser to its objections to the habeas judge's findings of fact. The State argues that it could not have submitted its objections or Judge Wisser's supporting affidavit to the habeas judge because that judge signed his findings on the very last day of his judicial office. The habeas record was then transmitted to this Court. Although we could remand this case for further proceedings and consideration of Judge Wisser's affidavit, that is not necessary to our resolution of applicant's claims.

additional funds to retain experts such as Dr. McGeorge and a biomechanical expert. I explained to the judge why we needed these experts, and I did not think that my current team was adequate to counter the State's case. Judge [Wisser] told me that he had authorized more experts than usual in a non-capital case, and that he would not pay for any more expert assistance regardless of my need. Based on the judge's ruling, I was forced to work within the constraints imposed by the Court. Ms. Jimenez was indigent, and I could not afford to hire these experts out of pocket.

There is nothing in the trial record that reflects this conversation. And there is nothing in either the trial or habeas record that shows when this conversation occurred. This is a critical omission because the reasonableness of a trial judge's denial of an *Ake* motion depends upon the specific information that the trial judge had in front of him at the time that he denied that motion.[41] Further, applicant did not include any such assertions or evidence supporting her *Ake* claim in her motion for new trial. And she did not raise this issue on direct appeal.

**C.    May an *Ake* Claim Be Considered When It Is First Raised in a Post-Conviction Writ of Habeas Corpus?**

We ordered the parties to brief a threshold issue to determine whether applicant could

---

[41] *See, e.g., Moore v. Kemp*, 809 F.2d 702, 710 (11th Cir. 1987) (rejecting defendant's habeas claim that the trial judge erred in denying his *Ake* motion based on the materials he had before him at the time of his ruling; "we must assess the reasonableness of the trial judge's action at the time he took it. This assessment necessarily turns on the sufficiency of the petitioner's explanation as to why he needed an expert. That is, having heard petitioner's explanation, should the trial judge have concluded that unless he granted his request petitioner would likely be denied an adequate opportunity fairly to confront the State's case and to present his defense?"); *Conklin v. Schofield*, 366 F.3d 1191, 1208 (11th Cir. 2004) ("In determining the reasonableness of the trial court's refusal to provide independent expert assistance, we consider only the facts available to the trial judge when he made a ruling on the particular motion"); *State v. Moore*, 364 S.E.2d 648 (N. C. 1988) ("In determining whether the defendant has made the requisite showing of his particularized need for the requested expert, the court should consider all the facts and circumstances known to it at the time the motion for psychiatric assistance is made.") (internal quotation marks omitted).

raise her *Ake* claim for the first time in an application for a writ of habeas corpus. Ordinarily a convicted person may not raise an issue in a habeas proceeding if the applicant could have raised that issue on direct appeal.[42] Even constitutional claims are "forfeited if the applicant had the opportunity to raise the issue on appeal. This is because the writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law."[43] Indeed, we recently noted our "trend. . . to draw stricter boundaries regarding what claims may be advanced on habeas" petitions because "'the Great Writ should not be used' to litigate matters 'which should have been raised on appeal' or at trial[.]"[44]

Applicant admits that, under normal circumstances, a defendant must preserve an *Ake* claim in the trial court and raise it on direct appeal.[45] This is because it is a record-based claim–dependent upon a written motion and formal ruling–that must be made and resolved

---

[42] *See Ex parte Nelson*, 137 S.W.3d 666, 667 (Tex. Crim. App. 2004) ("We have said countless times that habeas corpus cannot be used as a substitute for appeal, and that it may not be used to bring claims that could have been brought on appeal."); *Ex parte Goodman*, 816 S.W.2d 383, 385 (Tex .Crim. App. 1991) (it is well settled "that the writ of habeas corpus should not be used to litigate matters which should have been raised on direct appeal."); *Ex parte Bagley*, 509 S.W.2d 332, 334 (Tex. Crim. App. 1974) ("We, therefore, hold that the contemporaneous objection rule serves a legitimate State interest in this question, and that the failure of petitioner, as defendant, to object at the trial, and to pursue vindication of a constitutional right of which he was put on notice on appeal, constitutes a waiver of the position he now asserts" in an application for habeas corpus relief).

[43] *Ex parte Townsend*, 137 S.W.3d 79, 81-82 (Tex. Crim. App. 2004).

[44] *Ex parte Richardson*, 201 S.W.3d 712, 713 (Tex. Crim. App. 2006).

[45] Applicant's Brief at 30 ("Ordinarily an *Ake* claim can be considered on appeal because the record will reflect a written motion requesting funds and an order denying those funds.").

before the trial begins.[46]  Applicant claims that we should make an exception to that rule

because here "the record is not adequate to evaluate her *Ake* claim because of the established

informal practice of considering funding requests utilized by trial counsel and the Court."[47]

According to trial counsel's second affidavit, his routine practice for implementing *Ake*

requests was to meet informally with the trial judge and explain his need for an expert.

> If the judge decided to authorize payment, I would then file a motion
> requesting expert assistance that would simply state my need for the expert.
> This motion would be granted, as authorized in the prior *ex parte* conversation
> in chambers.

But *Ake* does not authorize such an informal methodology in seeking expert assistance, and

such an off-the-record informal meeting will not itself preserve a claim to the entitlement of

expert assistance for judicial review by the appellate courts in Texas either on direct appeal

or habeas review.  The contemporaneous objection rule applies to *Ake* claims just as it

applies to other constitutional claims.[48]

---

[46] *See Moore v. Kemp*, 809 F.2d at 710. ("[A]n indigent defendant who did not have the assistance of an expert in preparing and presenting his case cannot be heard to complain about his conviction on due process grounds unless he made a timely request to the trial court for the provision of expert assistance, the court improperly denied the request, and the denial rendered the defendant's trial fundamentally unfair.").

[47] Applicant's Brief at 31.

[48] *See Ex parte Medellin*, 280 S.W.3d 854, 860 (Tex. Crim. App. 2008) (Cochran, J., concurring) ("In Texas, we have a contemporaneous objection rule which requires all litigants to make a timely request, claim, or objection or forfeit the right to raise that request, claim, or objection after trial. This same rule applies in every jurisdiction in America. As the Supreme Court explained over thirty years ago, the contemporaneous objection rule serves important judicial interests in American criminal cases and deserves respect throughout the land."); *see also Wainwright v. Sykes*, 433 U.S. 72, 88 (1977) ("A contemporaneous objection enables the record to be made with respect to the constitutional claim when the recollections of witnesses are

Before an indigent defendant is entitled to appointment and payment by the State for expert assistance, he must make a pretrial "preliminary showing" that is based upon more "than undeveloped assertions that the requested assistance would be beneficial."[49] Thus, in Texas, an indigent defendant will not be entitled to funding for experts absent adequate factual support in the written motion that he presents to the trial judge.

> In cases holding that a sufficient showing was not made under *Ake*, the defendant typically has failed to support his motion with affidavits or other evidence in support of his defensive theory, an explanation as to what his defensive theory was and why expert assistance would be helpful in establishing that theory, or a showing that there was reason to question the State's expert and proof.[50]

In *Williams*, we reiterated the importance of presenting affidavits or other information to the trial judge in making the required threshold showing.[51] We held that the defendant is entitled to present his motion and evidence in an *ex parte* hearing outside the presence of the prosecutor to protect the defendant from disclosing his defensive theory to the State before the trial has begun.[52]

But a trial judge does not err in denying an informal, off-the-record request for

---

freshest, not years later in a federal habeas proceeding. It enables the judge who observed the demeanor of those witnesses to make the factual determinations necessary for properly deciding the federal constitutional question.").

[49] *Williams v. State*, 958 S.W.2d 186, 192 (Tex. Crim. App. 1997) (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 323-24 n.1 (1985)).

[50] *Rey*, 897 S.W.2d at 341.

[51] *Williams*, 958 S.W.2d at 193-94.

[52] *Id.*

additional funding for experts when he is not presented with a written motion that contains affidavits or other evidence that would support the defendant's request.[53]   If Judge Wisser had denied an informal, off-the-record request for additional funding for experts, applicant could have preserved that constitutional issue by filing a formal motion *ex parte* with the appropriate affidavits or information supporting the request before trial.  Then she could have raised that claim in her motion for a new trial or on direct appeal.  But we cannot review the merits of an *Ake* claim on either direct appeal or  habeas review if the defendant failed to file a proper pretrial *Ake* motion that the trial judge denied.  In this case, applicant forfeited consideration of her *Ake* claim on habeas review because she failed to preserve her constitutional claim in the trial court by filing a proper written *Ake* motion and ensuring that the trial judge formally ruled on it.[54]

---

[53] *Id.*

[54] *See Ex parte Medellin*, 280 S.W.3d at 860 ("Texas courts have long followed the Supreme Court's reasoning concerning the importance of the contemporaneous objection rule in the fair, effective, and efficient operation of its state courts.").  As the United States Supreme Court has explained,

> The failure of the federal habeas courts generally to require compliance with a contemporaneous-objection rule tends to detract from the perception of the trial of a criminal case in state court as a decisive and portentous event. A defendant has been accused of a serious crime, and this is the time and place set for him to be tried by a jury of his peers and found either guilty or not guilty by that jury. To the greatest extent possible all issues which bear on this charge should be determined in this proceeding: the accused is in the court-room, the jury is in the box, the judge is on the bench, and the witnesses, having been subpoenaed and duly sworn, await their turn to testify. Society's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens. Any procedural rule which encourages the result that those proceedings be as free of error as possible is thoroughly desirable, and the contemporaneous-objection rule surely falls within this classification.

We therefore deny relief on this claim.

**III.**

Applicant also claims that she is entitled to a new trial based on her lead counsel's ineffective assistance. Specifically, she asserts that her lead counsel was deficient because (1) he hired Dr. Kanfer; and he failed to (2) object and request a mistrial and a continuance in response to Dr. Kanfer's cross-examination testimony; (3) retain other qualified experts; and (4) make a written request under *Ake* for retaining those experts. Applicant's counsel refers to this case as a "failure of forensics" because of these four interrelated deficiencies.

In *Strickland v. Washington*,[55] the United States Supreme Court recognized a criminal defendant's Sixth Amendment right to effective assistance of counsel because the "right to counsel plays a crucial role in the adversarial system" and "access to counsel's skill and knowledge is necessary to accord defendants the ample opportunity to meet the case of the prosecution to which they are entitled."[56] A person claiming that counsel was ineffective must prove, by a preponderance of the evidence, (1) that counsel's performance was deficient, falling below an "objective standard of reasonableness," and (2) that the deficient performance prejudiced the defense such that "there is a reasonable probability that, but for

---

*Sykes*, 433 U.S. at 90.

[55] 466 U.S. 668 (1984).

[56] *Id.* at 685.

counsel's unprofessional errors, the result of the proceeding would have been different."[57]

We "'indulge in a strong presumption that counsel's conduct [fell] within the wide range of reasonable assistance,' and that 'the challenged action might be considered sound trial strategy.'"[58] The mere fact that another attorney might have pursued a different tactic at trial does not suffice to prove a claim of ineffective assistance of counsel.[59] The *Strickland* test is judged by the "totality of the representation," not by counsel's isolated acts or omissions, and the test is applied from the viewpoint of an attorney at the time he acted, not through 20/20 hindsight.[60]

## A.    Counsel's Qualifications and Preparation.

Lead counsel did not testify at any of the habeas hearings, but he did submit two affidavits setting forth his qualifications, his strategy in this case, and explanations for his tactics. Counsel stated that he has been in practice for "more than 28 years . . . with never any disciplinary issue or finding of ineffectiveness." He is board certified in criminal law

---

[57] *Id.* at 694.

[58] *Ex parte White*, 160 S.W.3d 46, 51 (Tex. Crim. App. 2004) (quoting *Strickland*, 466 U.S. at 689).

[59] *Ex parte Miller*, 330 S.W.3d 610, 616 (Tex. Crim. App. 2009).

[60] *See Ex parte Wellborn*, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990); *Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

and is on the appointed-attorney capital-murder list for Travis County.[61]   He and his co-counsel, as well as his investigator, "undertook extensive interviews" with applicant and made every attempt to talk to the witnesses who had knowledge of the case and of applicant's character.  Because many of the witnesses "aligned with the State" declined to talk to lead counsel, he sent them letters almost a year before trial again asking them to talk with him.  Not one of them responded.  He and his team did speak to many witnesses who knew applicant "as well as family in Mexico with the help of the Mexican Consulate."  They learned as much as possible "about child abuse, the most common types of abuse, and the character traits of abusers."  Their research included "treatises, articles, cases reported, and speaking with experts," but they found no case of abuse similar to the present one.

"The theory of the [defense] case was that the child had accidentally swallowed the paper towels and that the efforts to help the child aggravated the condition resulting in complete occlusion of his airway for between 7 to 10 minutes. . . . The probable cause affidavit, offense reports, our client's statement, our experts' opinions, medical records, etc. were in many respects consistent with our theory."  The defense planned to put on character evidence to show that applicant was not the type of person who would abuse a child.  They worked with Dr. Parker, a psychologist, concerning applicant's mental state.

"The next part of the plan was to explain the accident with the testimony of Dr. Kanfer

---

[61] Counsel noted that he had tried "10 or more jury trials within the [past] 18 months alone."  He listed some of the them as a capital murder trial, four homicides, an aggravated robbery, aggravated kidnapping, and aggravated assault.  He had submitted three appellate briefs, and settled numerous other felony cases.

and the demonstrative evidence of Mr. Kristelis. We would demonstrate how the accident could have happened, which was consistent with the evidence and explained why the child had no injury." Experienced counsel was not ineffective in his pretrial preparation and focus upon the primary contested issue.

**B.      The Retention of Dr. Kanfer**.

Counsel stated that it was very hard to find an expert willing to accept the low pay of an appointed case and "we do not have the type of funds that give us the luxury of getting anyone we want. . . . Dr. Kanfer was willing to take the appointed case and worked very hard to find the truth. He worked on this case for a year and did not even charge all his time." He worked with Dr. Henry Lee (of the O.J. Simpson case) who had referred Dr. Kanfer to lead counsel. "Dr. Kanfer worked numerous difficult cases and had extensive experience in testifying." Dr. Kanfer had worked as a medical examiner for the State of Connecticut for almost twenty years by the time of trial. He had testified as an expert witness about 350 times. In the hearing outside the jury to qualify Dr. Kanter as an expert witness, the trial judge concluded that "in all candor, obviously, this gentleman's going to be able to testify. . . .I mean, this isn't a close call so–it should be apparent to everyone."

Dr. Kanfer's direct testimony clearly and cogently laid out the scientific and medical basis for his opinion that B.G.'s choking was accidentally caused by the toddler's act of wadding up the paper towels and stuffing them into his own mouth. Dr. Kanfer had even conducted an experiment to show how that could have occurred. Nowhere does applicant

find fault with the direct testimony of Dr. Kanfer, the content of his opinions, or the scientific basis for those opinions.

Indeed, applicant acknowledges that "Dr. Kanfer's opinions were generally sound and supportive of her case,"[62] but she complains about his lack of pediatric training. Dr. Kanfer may not have been a specialist in pediatric forensic pathology, but trial counsel concluded that he had some pediatric experience, both as an expert in the "Boston Nanny" case and because he filed a motion for continuance shortly before the trial was originally scheduled in September of 2004, asking for additional preparation time and noting that "Counsel is not ready in that he has just very recently gotten an expert to aid in the case. There were several difficulties in finding and employing an expert with experience in pediatrics." The trial was postponed for almost a full year, during which time counsel worked with Dr. Kanfer, who, as counsel stated, had some experience in pediatrics. A forensic pathologist like Dr. Kanfer (and Drs. Peacock and Parangao who testified at trial) is ideally situated to determine the cause and manner of death in suspicious circumstances. That is what pathologists do. Dr. Peacock testified that "the discipline of forensic pathology is a discipline where common sense meets science and we utilize both articles that are written with their statistical probabilities and we use common sense." We have noted that "[c]ausation or mechanism of death are examples of important medical questions addressed by pathologists that require

---

[62] Memorandum in Support of Supplemental Application at 41.

more than an objective or rote determination."[63]  Counsel was not, therefore, ineffective for retaining Dr. Kanfer.

**C.     Trial Counsel's Failure to Request a Mistrial or Continuance in Response to Dr. Kanfer's Use of Profanity.**

The real problem that applicant notes (and the habeas judge found) was in Dr. Kanfer's unfortunate remark, including an expletive verb, to the lead prosecutor in the hallway during a break in the proceedings and the prosecutor's repeated references to that remark in front of the jury.[64]  This was an infelicitous incident and probably quite damaging to Dr. Kanfer's credibility as a neutral scientific expert.  However, trial counsel had done his best to prepare Dr. Kanfer for the prosecutor's aggressive and confrontational style.  Counsel stated that he was well aware of both the prosecutor's penchant for attacking defense witnesses and the trial judge's willingness to give the attorneys leeway in their questioning:

> We knew [she] would attack our expert.  We calculated that if Dr. Kanfer could withstand the attack, it would hurt the State.  I also felt that if I tried to protect the witness he would lose credibility. . . . No one regretted the exchange between Dr. Kanfer and [the prosecutor] more than Dr. Kanfer himself.  He had been prepared and knew what to expect and was supposed to be ready to handle it.  Some judges would never have allowed some of the prosecutors' tactics, objection or no objection, but I knew Judge Wisser would, that is why Dr. Kanfer was prepared.

We conclude that counsel's belief was reasonable under the circumstances as Dr. Kanfer was an experienced forensic pathologist who had testified in some 350 trials.  Applicant does not

---

[63] *Rey v. State*, 897 S.W.2d 333, 338 (Tex. Crim. App. 1995).

[64] *See supra* note 14.

explain how lead counsel could have, or should have, known that Dr. Kanfer would "blow up" at the prosecutor in the hallway.

Applicant also asserts that, after Dr. Kanfer's outburst, lead counsel should have asked for a continuance or a mistrial because of this "highly prejudicial conduct." But applicant does not explain the legal basis for such a request, other than to say counsel "failed to act appropriately." But what was he supposed to do? The trial judge overruled his objection, and the court of appeals held that the prosecutor was entitled to refer to the hallway colloquy to show Dr. Kanfer's bias against the prosecutor and the State's position.[65] And the correctness of those legal rulings is not before us in this habeas proceeding.

Counsel explained his strategy in not always objecting to the prosecutor's sarcasm, sidebar remarks, and "mistreatment of defense witnesses":[66]

> It was my decision based on what I thought was an outlandish theory by the State to give [the prosecutor] a great deal of leeway as I thought her behavior would alienate a jury and combined with an outlandish theory would enure to our benefit. We knew, and it is basic, that if you attack a witness, who is not a party, juries do not like it.
> . . .
> [Counsel's strategy] was considered after trial counsel had received feedback from prior jurors who completely disliked her and her sarcastic, mean-spirited approach. It was determined that we would allow her some

---

[65] *Jimenez*, 240 S.W.3d at 403 (citing *London v. State*, 739 S.W.2d 842, 846 (Tex. Crim. App. 1987) ("The State is clearly entitled to show any bias a defense witness might have against the State or the prosecutor.").

[66] Applicant raised several issues about the prosecutor's tactics on appeal, but the court of appeals noted that "the prosecutor's sarcasm in this case was not directed at the defendant personally," and it held that her conduct did "not rise to a level that it 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" 240 S.W.3d at 411-12.

freedom to be[] herself.

Given these considerations, trial counsel's strategy was not unreasonable.  First, the reasonableness of his decision to retain and call Dr. Kanfer as an expert witness must be assessed at the time counsel retained Dr. Kanfer and at the time he called him to the witness stand–not at the time Dr. Kanfer used an expletive during a break in the proceedings.[67]

Second, in this case, unlike the two cases applicant cites in her brief,[68] Dr. Kanfer was clearly competent to testify to applicant's theory of B.G.'s cause of death, and he testified on direct examination exactly as predicted and anticipated.

---

[67] *Strickland*, 466 U.S. at 690 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."); *see also Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) ("Ineffective-assistance-of-counsel claims will be raised only in those cases where a defendant has been found guilty of the offense charged, and from the perspective of hindsight there is a natural tendency to speculate as to whether a different trial strategy might have been more successful."); *Ingham v. State,* 679 S.W.2d 503, 509 (Tex. Crim. App. 1984) (when determining the validity of an ineffective assistance of counsel claim, any judicial review must be highly deferential to trial counsel and avoid "the distorting effects of hindsight").

[68] Applicant cites *Turpin v. Bennett*, 525 S.E.2d 354, 355 (Ga. 2000) (counsel was ineffective in putting psychiatrist who had AIDS dementia on witness stand when he knew psychiatrist, who looked "deathly ill," was physically and mentally disabled; witness became incoherent and irrational and jury "laughed out loud at his testimony"), and *Skaggs v. Parker*, 235 F.3d 261, 273 (6th Cir. 2000) (although attorneys were not ineffective for failing to investigate fraud artist who claimed to be a psychiatrist before trial and for sponsoring his testimony at guilt stage (he "was awful.  He was incoherent.  He was talking about things that didn't make sense.  You couldn't stop him.  You couldn't reel him back in.  People in the audience were laughing at him."), they were ineffective for recalling him during retrial punishment hearing when they knew, by then, he was incompetent and incoherent), but in each of those cases, defense counsel were clearly on notice as to the serious mental deficiencies of the expert before calling them to the witness stand.  The same is not true in this case.  Dr. Kanfer testified exactly as anticipated on direct examination and throughout the first cross-examination session.

Third, a reasonable attorney could not have been expected to predict that, despite defense counsel's warning about the prosecutor's aggressive style, his experienced expert would make profane remarks during a break.

In hindsight, counsel clearly should not have let Dr. Kanfer come anywhere near the prosecutor during any breaks, but that single failure does not make counsel ineffective. In sum, trial counsel's performance in retaining Dr. Kanfer and calling him as an expert witness was not deficient.

Furthermore, counsel was not deficient for failing to ask for a mistrial or continuance. A mistrial is "a remedy appropriate for a narrow class of highly prejudicial and incurable errors."[69] But applicant has failed to show that there was any error in the prosecutor impeaching Dr. Kanfer with his inappropriate remark to show his bias. Indeed, the trial judge overruled counsel's objection to this line of questioning, so he clearly would not have granted a mistrial or continuance if counsel had requested one.[70] The failure to object to

---

[69] *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000).

[70] Judge Wisser, the judge present in the courtroom and most attuned to the tone of the questions asked and responses given, was in the best position to decide whether this line of questioning required either a mistrial or a continuance. Having overruled defense counsel's objection, he had determined that the questioning was permissible and thus no remedial action (such as an instruction to disregard) was necessary, much less the more extreme remedy of a continuance or mistrial. A trial judge may grant a continuance when a fair trial becomes impossible due to an unexpected occurrence during trial. *Cooper v. State*, 509 S.W.2d 565, 567 (Tex. Crim. App. 1974). Applicant has failed to show what a continuance would have achieved as there has been no showing that counsel could have found, retained, and sponsored another expert to supplement Dr. Kanfer's testimony within a reasonable amount of time. *See Rische v. State*, 746 S.W.2d 287, 290 (Tex. App.–Houston [1ˢᵗ Dist.] 1988, no pet.) (recently deceased crime-reconstruction expert's opinion testimony was not sufficiently "material" to defense to warrant mistrial or indefinite continuance to locate new expert; defendant elicited same expert

proper questions and admissible testimony (and the failure to request a mistrial or continuance based upon that questioning) is not ineffective assistance.[71]

### D.     The Failure to Retain or Request Funding for Additional Experts.

Applicant asserts that her trial defense team–a team composed of three lawyers, two investigators, and two expert witnesses–retained with funding approved by the trial judge and paid for by the State, was inadequate.  She states that she has now found Dr. Zur (an expert in accidental choking), Dr. McCloskey (an expert in pediatric critical care anesthesiology and general pediatrics with training in child abuse), and Dr. Ophoven (an expert in pediatric forensic pathology), and that they could have testified at the time of trial as a "multidisciplinary team."   Indeed, they might have been able to, but that is not the issue.  It is certainly true that this trial was not a perfectly "level playing field" in terms of the number of expert witnesses on each side.

In an ideal world, it might well be wise to have an equal number of experts on each side of a lawsuit, each one matching the skill and experience of his opposing expert.

opinion from State's expert that his own expert would have offered, so testimony of another expert would have been merely cumulative; noting that "if an applicant for a continuance . . . does not present evidence to the court that indicates a probability that a substitute [witness] can be secured or that the continuance will not result in an indefinite delay, the motion may be properly denied.").

[71] *See, e.g., Ex parte White*, 160 S.W.3d 46, 53 (Tex. Crim. App. 2004) (defense counsel is not ineffective for failing to object to admissible evidence); *Muniz v. State*, 851 S.W.2d 238, 258 (Tex. Crim. App. 1993) (the failure to object to admissible evidence is not ineffective assistance of counsel); *Weinn v. State*, 281 S.W.3d 633, 641 (Tex. App.–Amarillo 2009) ("The failure of appellant's counsel to request a mistrial could only be termed an act of ineffective assistance of counsel if a mistrial should have been granted."), *aff'd on other grounds* 326 S.W.3d 189 (Tex. Crim. App. 2010).

Applicant makes a compelling argument that she was outclassed and outmatched by the State's numerous experts. But the issue before us is whether the constitution requires that an indigent defendant be provided with an absolute (or even rough) equivalency of experts when the primary contested issue at trial involves the cause of death. We cannot find that *Ake* stretches that far. Instead, we must conclude that applicant does not have a constitutional right to a "team of experts" paid for by the taxpayers, and applicant's counsel is not ineffective in failing to request such a team.

The issue is whether counsel's failure to hire (or to request the trial judge to appoint and provide funding for) additional experts created "a high risk of an inaccurate verdict."[72] This case depended, in large part, upon medical forensics and the question of whether B.G. could have accidentally stuffed the wad of paper towels into his mouth by himself or whether someone else–presumably applicant–must have done so. Applicant was clearly entitled to access to an expert who could speak knowledgeably on that question to build an effective defense, but she has not shown that the failure to have additional experts, beyond Dr. Kanfer, to address that question created "a high risk of an inaccurate verdict."[73]

The additional experts that applicant has now produced are perhaps even more

---

[72] *Ake*, 470 U.S. at 77 (State must ensure that an indigent defendant "has access to the raw materials integral to the building of an effective defense," but "the State need not "purchase for an indigent defendant all the assistance that his wealthier counterparts might buy,"); *Busby v. State*, 990 S.W.2d 263, 271 (Tex. Crim. App.) (per curiam) ("The key question [under *Ake*] appears to be whether there is a high risk of an inaccurate verdict absent the appointment of the requested expert.").

[73] *Id.*

qualified than Dr. Kanfer, but she has not shown how their testimony would be significantly different or more persuasive than was Dr. Kanfer's. They reached exactly the same ultimate opinion as Dr. Kanfer and for almost precisely the same reasons. Applicant implies that because a "multidisciplinary team of experts (including three pediatric specialists) testified for the State," she was entitled to a similar team. First, the State called two treating doctors–not retained experts–to testify to the facts they observed and the care that they provided to B.G. Their opinions concerning the cause of his death were based upon their first-hand involvement with the toddler; the State did not retain them as part of a multidisciplinary team of testifying experts. So far as we can tell from the record, Dr. Alexander was the only expert specifically retained by the State. Second, *Ake* does not require the appointment of a defense expert to match every State expert. *Ake* ensures that an indigent defendant has access to at least the "basic tools" of a defense, but applicant cites no case from any jurisdiction that states that an indigent defendant is entitled to multiple experts to testify to the same ultimate opinion on the same topic or that such a defendant is entitled to match the State expert for expert.

Applicant's counsel was not ineffective for failing to file a written *Ake* request for additional funding to retain more experts to testify on the defense theory that B.G. could have crumpled up the paper towels by himself, stuffed that wad into his mouth, and accidentally choked on it. The defensive theory, buttressed by Dr. Kanfer's testimony, was cogently, coherently, and completely presented to the jury. Additional defense medical experts would

surely have been helpful, but they were not constitutionally required. Applicant has not shown that, if his attorney had retained (or requested funding for) more experts to testify to the same theory, the result of the trial likely would have been different.[74]

We therefore conclude that counsel was not ineffective under the *Strickland* standard.

**IV.**

Because we conclude that applicant has failed to prove, by a preponderance of the evidence, any of the claims set out in either her original or supplemental application for a writ of habeas corpus, we deny relief.

Delivered: April 25, 2012
Publish

---

[74] *Ake*, 470 U.S. at 77.