

# Fourth Court of Appeals

## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-17-00524-CR

Lloyd Ray **MCKINNEY**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the County Court at Law No. 2, Guadalupe County, Texas
Trial Court No. CCL-16-1094
Honorable Frank Follis, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:    Sandee Bryan Marion, Chief Justice
Karen Angelini, Justice
Irene Rios, Justice

Delivered and Filed:  June 13, 2018

AFFIRMED

Lloyd Ray McKinney was charged with the misdemeanor offense of assault causing bodily injury-family violence. After a jury trial, he was found guilty and sentenced to 365 days of confinement in jail and assessed a $4,000 fine. On appeal, he argues he was denied effective assistance of counsel. We affirm.

### BACKGROUND

At trial, the complainant, Graciela P., testified that she lived with McKinney, had been in a long-term relationship with him, and had two children with him. According to Graciela P., on

October 6, 2016 at approximately 10:00 p.m., as she and McKinney were going to bed for the night, they got into an argument because she told him she wanted to end their relationship. Graciela P. testified McKinney "choked" her, grabbed her by the neck, lifted her off the bed, and threw her to the tile floor, causing her head to hit the ground. According to Graciela P., McKinney told her she was "stupid" and called her "the 'B' word." McKinney then lifted her "off of the floor" and "threw [her] to the restroom" where "he proceeded to choke [her] and kick" her legs, stomach, and chest. Graciela P. testified the back of her head hit the tub. The prosecutor then noted that Graciela P. had testified McKinney had "choked" her twice. The prosecutor asked, "So can you describe for the jury what that was like?" Graciela P. responded, "It was painful. *I was in shock because I didn't expect it*." (emphasis added). Graciela P. explained McKinney had used both of his hands to choke her in the restroom. She was "at the point of blacking out" when he let go. McKinney then began kicking her in the legs, stomach, and chest as she was lying on the ground. He stopped and walked away while yelling at her. McKinney then came back, picked her up by her hair, and threw her on the bed. Graciela P. testified she is five feet one-and-a-half inches tall and weighed ninety-two pounds at the time of the incident. She testified McKinney is five feet eight inches tall and weighed approximately 160 to 180 pounds at the time of the incident.

Graciela P. testified that during this incident, she was never physically aggressive towards McKinney. She "just wanted him to stop." She testified she was crying and in pain, "asking him to stop." McKinney "was just pacing back and forth." "He finally stopped; then he said sorry and that he wasn't like that and he went to bed." Graciela P. testified she waited for him to go to sleep and then eventually fell asleep herself. According to Graciela P., the children remained asleep during the incident. The next morning, which was a Friday, Graciela P. woke up in a lot of pain and called in sick to work. She suffered from bruises, scrapes, and a bump on her head. She testified "everything" hurt. On Saturday, she left the house to go to the grocery store and then she went to

the police station to make a report. According to Graciela P., she did not immediately call the police after the incident:

> I was scared and I know he would have noticed if I did. And I was in so much pain the next day it was just, I was just in shock. . . . I left with the kids in the morning to go to the grocery store and I rushed so I can try to make time to try to go report him at the police station but I had to rush or he would get angry at me if I took too long.

Graciela P. was then asked to look at photographs taken at the police station that depicted her injuries. The photographs were introduced in evidence.

On cross-examination, defense counsel began trying to pick apart Graciela P.'s testimony about the sequence of events. Defense counsel then asked why Graciela P. waited two days to go to the police:

> Q: So, when you woke up the morning after October the 6th and you were in this terrible pain that you didn't – that caused you not to be able to go to work?
> A: Yes.
> Q: Was the pain worse on that morning or was it worse the night before?
> A: It was worse that morning.
> Q: It was worse that morning? Okay. So, Ms. Graciela P., my question, if the – Why not – why not go to the – the doctor – to the hospital if the pain was as excruciating as you say?
> A: Because I could hardly move and I know he didn't want to take me because he would get in trouble.
> Q: Okay. Why—So, help me understand, why the grocery store before medical attention if you were in so much pain?
> A: Because after you go through something like that, you're sore. So the next day after I was in pain but after that, I was still a little sore but I was able to move.

Defense counsel then referred to Graciela P.'s testimony during direct examination where she testified she was "shocked" that the incident happened:

> Q: Okay. You said, "when things like this happen."[1] From your testimony you were shocked that this happened. So, this has never happened before because you were shocked; correct?
> A: It happened before. But this is the one that I reported.
> Q: But your – your testimony – You testified earlier that you were shocked that this happened; correct?

---

[1] Graciela P. did not testify "when things like this happen." She testified, "I was in shock because I didn't expect it."

A: Yes, because it was unexpected. He – he had – We got into an argument and we were about to go to bed. You don't expect somebody to just get angry and start choking you and throwing you around.

Q: Not even if – if they've done it before?

A: He's off the wall. You don't know when he's going to do it or when he's not.

Q: But your testimony was that you were shocked.

Defense counsel then began questioning Graciela P. about differences in the police report and her testimony at trial:

Q: Ms. Graciela P., would it shock you at all if I told you that this is the very first time I've ever heard of your face hitting the cement, like that is not in this report, would that surprise you at all?

A: No.

Q: That would not? Why not?

A: Because I know what I remember.

Defense counsel then questioned why the police report mentioned nothing about Graciela P. being thrown in the bed and whether the omission from the police report surprised her. Graciela P. replied, "No." Defense counsel asked, "Why not?" Graciela P. replied, "Because I know you're kind of making it seem like my whole statement is false."

After defense counsel finished his cross-examination, the prosecutor approached the bench and asked to go into prior incidences of domestic violence between McKinney and Graciela P., arguing that defense counsel "opened the door" by his questioning of Graciela P. The trial judge granted the request and permitted the State "to present evidence concerning previous similar incidents of violence between the defendant and the victim, limited to what is listed on the State's Second Amended Notice of Extraneous Offenses."

The prosecutor then questioned Graciela P. about the first time McKinney "put his hand on [her]." Graciela P. testified it was in 2012 when they got into an argument and McKinney choked her until she blacked out and woke up on the floor. She did not report this incident, because she "was confused" and "didn't expect that from him." Graciela P. testified the next "few times" involved "choking scuffles." She testified that one time, McKinney "slammed [her] head on the

cement floor while he was choking [her]." She got a "mild concussion" and went to the hospital. On cross-examination, Graciela P. admitted that she had told the medical staff at the hospital she had slipped on a ball while playing with her kids. She testified she gave this excuse because McKinney had told her to do so.

Graciela P. also testified in late 2015 to early 2016, while she was pregnant, she and McKinney "were arguing" and "he threw [her] on the bed, like pushed [her] on the bed." After her son was born, there was an incident where they were having an argument in the kitchen "about infidelity and he got angry so he came at [her], choked [her], threw [her] on the ground, and put his foot on [her] face while putting all of his weight against [her] head."

On cross-examination, defense counsel asked why she did not report all these other incidents to the police. Graciela P. replied that she reported the last incident because she realized McKinney was not going to stop. Defense counsel asked why she did not come to that realization after the second alleged incident. According to Graciela P., McKinney "kept convincing [her] that he wouldn't do it again."

> Q: Okay. Ms. Graciela P., I want to rewind a little. So, in 2012 there were two incidents; 2015, at least one; 2016; at least one. You never reported this to anybody? To the police? Anybody? I'm trying to wrap my brain around why. You – you testified earlier that you were shocked but this has happened, according to your testimony, it's happened several times. Why are you shocked?
> A: Because he catches you off guard. You don't know when he's going to do it and when he is.
> Q: Wouldn't that be more of a reason to get away because he's so – he's so unpredictable?
> A: When you're in love you do stupid things.

After Graciela P. testified, the trial court admonished the jury about these other incidents of alleged domestic violence:

> [Y]ou have just heard some evidence that there may have been some other previous incidents occurring between Ms. Graciela P. and Mr. McKinney prior to the one that is on trial. I'm going to admonish you that Mr. McKinney is on trial for the

offense that's alleged to have occurred on October the 6th of 2016. He is not on trial for any previous offense. Those previous incidents were introduced for the purpose of letting you – help you decide the defendant's motive, intent, knowledge, or lack of accident involving the incident on October 6th. They are not introduced for you to determine Mr. McKinney's character. Mr. McKinney's character is not on trial in this case. So your consideration of those extraneous, as we call them, or extra offenses occurring before October 6, 2016 will be limited to you using those to determine if it helps you to determine the defendant's motive, intent, knowledge, or lack of accident concerning events on October 6th of 2016.

The only other witness was Officer Joe Brown, who testified about taking Graciela P.'s statement at the police station and taking pictures of her injuries. McKinney did not testify in his own defense. The jury returned a guilty verdict.

## DISCUSSION

On appeal, McKinney argues his trial counsel was ineffective because he "opened the door" to the admission of extraneous conduct between Graciela P. and McKinney by asking Graciela P. the following question: "You said, 'when things like this happen.' From your testimony you were shocked that this happened. So this has never happened before because you were shocked; correct?" McKinney argues trial counsel had prior notice from the State of extraneous conduct; the extraneous conduct was highly prejudicial to McKinney; there was no plausible basis in strategy or tactics for trial counsel's actions; and there is a reasonable probability that the result of the trial would have been different if trial counsel had not opened the door to the extraneous conduct.

We measure a claim of ineffective assistance of counsel against the two-prong test established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *See Hernandez v. State*, 726 S.W.2d 53, 55-57 (Tex. Crim. App. 1986) (applying *Strickland* test). A person claiming that counsel was ineffective must prove, by a preponderance of the evidence, that (1) counsel's performance was deficient, falling below an "objective standard of reasonableness," and (2) the deficient performance prejudiced the defense such that "there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012) (quotation omitted). Further, we "indulge in a strong presumption that counsel's conduct fell within the wide range of reasonable assistance and that the challenged action might be considered sound trial strategy." *Id.* (quotation omitted). "The mere fact that another attorney might have pursued a different tactic at trial does not suffice to prove a claim of ineffective assistance of counsel." *Id.*

"The *Strickland* test is judged by the 'totality of the representation,' not by counsel's isolated acts or omissions, and the test is applied from the viewpoint of an attorney at the time he acted, not through 20/20 hindsight." *Id.* Thus, "[a]ny allegation of ineffectiveness must be firmly founded in the record, and the record *must affirmatively demonstrate the alleged ineffectiveness*." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) (emphasis added). "Under normal circumstances, the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decisionmaking as to overcome the presumption that counsel's conduct was reasonable and professional." *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). "[R]arely will the trial record contain sufficient information to permit a reviewing court to fairly evaluate the merits of such a serious allegation." *Id.*; *Thompson*, 9 S.W.3d at 813. In the "majority of cases, the record on direct appeal is simply undeveloped and cannot adequately reflect the failings of trial counsel." *Id.* (quoting *Thompson*, 9 S.W.3d at 813). "Trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012) (quotation omitted). "If trial counsel is not given that opportunity, then the appellate court should not find deficient performance unless the challenged conduct was so outrageous that no competent attorney would have engaged in it." *Id.* (quotation omitted).

Here, McKinney did not file a motion for new trial on ineffectiveness or request a hearing on ineffectiveness. There is simply nothing in the appellate record to reflect trial counsel's reasons for asking Graciela P. the question he did. And, trial counsel has not been given an opportunity to explain his actions. *See id.* We thus consider whether trial counsel's conduct "was so outrageous that no competent attorney would have engaged in it." *Id.*

In looking at the question posed by trial counsel in context, it is possible trial counsel was attempting to limit Graciela P.'s testimony to one occasion and then cross-examine her about inconsistencies and inaccuracies in her testimony about that occasion. In reading trial counsel's entire cross-examination of Graciela P., we cannot conclude the question posed by defense counsel was so outrageous that no attorney would have engaged in it. We judge a claim of ineffectiveness by the totality of the representation, and the record reflects that trial counsel's strategy was showing Graciela P. was not being truthful about her accusations against McKinney. Trial counsel advanced this strategy through his questioning of Graciela P. and attempted to show the jury members inconsistencies and inaccuracies in her testimony. In considering the totality of the representation as shown in the appellate record, we cannot conclude ineffectiveness is firmly founded in the record. In such a situation, the issue is better presented within the framework of a post-conviction writ of habeas corpus under article 11.07 of the code of criminal procedure. TEX. CODE CRIM. PROC. ANN. art. 11.07 (West 2015); *Ex parte Torres*, 943 S.W.2d 469, 475-76 (Tex. Crim. App. 1997); *see also Thompson*, 9 S.W.3d at 813 ("A substantial risk of failure accompanies an appellant's claim of ineffective assistance of counsel on direct appeal. Rarely will a reviewing court be provided the opportunity to make its determination on direct appeal with a record capable of providing a fair evaluation of the merits of the claim . . . .").

We therefore affirm the judgment of the trial court.

Karen Angelini, Justice

Do not publish