

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00373-CR

Hector **RIVERA** Jr.,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 111th Judicial District Court, Webb County, Texas
Trial Court No. 2019CRB000096D2
Honorable Monica Z. Notzon, Judge Presiding

Opinion by:     Beth Watkins, Justice

Sitting:          Irene Rios, Justice
                 Beth Watkins, Justice
                 Lori I. Valenzuela, Justice

Delivered and Filed: June 7, 2023

AFFIRMED

Appellant Hector Rivera Jr. challenges his conviction for murder and aggravated assault.

We affirm the judgment.

### BACKGROUND

In the early morning hours of November 2, 2018, Rivera and his friends Victor Sauceda,

Sergio Palacios, and Norberto Adame visited Club Vibe in Laredo. While they were at the club,

Rivera saw "a group of three or four guys" that he believed were "very dangerous people" staring

at Adame. A fight broke out near closing time, and Rivera testified that one of the men who had

been staring at his friends "threw the first punch" at Adame.[1] Rivera, Sauceda, and Adame were all injured in the fight.

During the fight, Rivera heard gunshots, so he retrieved an AR-15 rifle from Sauceda's vehicle, a white Lincoln MKZ. Rivera testified that he purchased the AR-15 in his own name but he and Sauceda owned it jointly. There is no evidence that Rivera fired, brandished, or otherwise used the AR-15 during the fight.

When the fight ended and the crowd dispersed, Sauceda, Palacios, and Adame left the club in Sauceda's car. Rivera left in his own vehicle, a maroon Dodge Charger. When he drove away, Rivera had the AR-15 with him.

Rivera testified that after he left the club, a black Chrysler pulled up next to him at an intersection and he "exchange[d] words with" its occupants, Lesther Julian Castro and Jose Jesus "Jay" Martinez. Like Rivera, Castro and Martinez had been at Club Vibe during the fight. Rivera testified that he "was terrified" when Castro and Martinez approached "because they had just beaten me up." He pointed the AR-15 at Castro and Martinez, but he did not fire it. He testified that he sped away and Castro and Martinez began chasing him. Rivera called Sauceda and told him he "was very scared" and "was being chased by a black car." Castro and Martinez passed Rivera "after a couple of red lights," and Rivera testified that he "felt a bit safe" at that point. Castro agreed that he drove past Rivera, but he denied having chased him.

At trial, the State presented footage from a surveillance camera at a convenience store located near the path of the alleged chase. The surveillance video showed the black Chrysler turning right at an intersection shortly after the alleged chase ended. Immediately afterward, Rivera's maroon Charger and Sauceda's white Lincoln appeared at the same intersection and

---

[1] While Rivera did not testify in this case, the trial court admitted his testimony from a separate proceeding into evidence.

briefly stopped. While the two vehicles were stopped, Rivera passed the AR-15 to the occupants of the white Lincoln. Rivera testified that he handed off the AR-15 because its other owner, Sauceda, asked for it. Both Rivera and Sauceda then turned right, in the same direction as the black Chrysler. Seconds later, the surveillance camera captured the sound of approximately two dozen gunshots that occurred outside the view of the camera.

Police called to the scene discovered the black Chrysler on the side of the road with Castro and Martinez still inside. Both had been shot. Castro survived his injuries; Martinez did not.

It is undisputed that Rivera was not the shooter. Nevertheless, he was arrested and charged with murder and aggravated assault.[2] For both counts, the indictment alleged Rivera "act[ed] alone or as a party" to the charged offenses. After hearing the evidence, a Webb County jury found Rivera guilty as charged and recommended a sentence of ten years' confinement for the murder and five years' confinement for the aggravated assault. The trial court signed a judgment consistent with the jury's verdict and ordered Rivera's sentences to run concurrently. Rivera now appeals.

## ANALYSIS

### *Ineffective Assistance of Counsel*

In his first three issues, Rivera argues he received ineffective assistance of counsel because his trial counsel purportedly failed to: (1) file an *Ake* motion seeking funds to hire an expert witness; (2) serve a subpoena duces tecum on Castro's cell phone provider; and (3) object to translation issues at trial.

---

[2] In separate proceedings, Sauceda and Adame were also charged with murder and aggravated assault. Sauceda testified in this case that he pleaded guilty to the charges. A Webb County jury found Adame guilty, and we affirmed his conviction. *See Adame v. State*, No. 04-21-00260-CR, 2023 WL 3082422, at *1 (Tex. App.—San Antonio Apr. 26, 2023, no pet.) (mem. op., not designated for publication).

*Standard of Review and Applicable Law*

In reviewing a claim of ineffective assistance of counsel, we apply a two-pronged test. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). On the first prong, the appellant must demonstrate his trial counsel's representation was so deficient "that no reasonable trial strategy could justify trial counsel's acts or omissions[.]" *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011); *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). On the second prong, "the appellant must show a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different." *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Our review of trial counsel's performance "is highly deferential and presumes that counsel's actions fell within the wide range of reasonable and professional assistance." *Bone*, 77 S.W.3d at 833. The alleged ineffectiveness "must be firmly founded in the record." *Id.* at 835 (internal quotation marks omitted). Where the record is silent as to the reasons for trial counsel's conduct, he is entitled to "the benefit of the doubt," and we must assume that he "had a strategy if any reasonably sound strategic motivation can be imagined." *Johnson v. State*, 624 S.W.3d 579, 586 (Tex. Crim. App. 2021). We do not examine "isolated acts or omissions," but instead analyze trial counsel's performance "in light of the totality of the representation[.]" *Scheanette v. State*, 144 S.W.3d 503, 509 (Tex. Crim. App. 2004) (internal quotation marks omitted).

Typically, the record in a direct appeal will not be sufficiently developed to support an ineffective assistance claim because it will not show the reasons for trial counsel's challenged actions. *See, e.g., id.* at 510. Consequently, ineffective assistance claims "are generally not successful on direct appeal and are more appropriately urged in a hearing on an application for a writ of habeas corpus." *Lopez*, 343 S.W.3d at 143. If an appellant's trial counsel has not had an

opportunity to explain his actions, we "should not find deficient performance unless the challenged conduct was so outrageous that no competent attorney would have engaged in it." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (internal quotation marks omitted). "The mere fact that another attorney might have pursued a different tactic at trial does not suffice to prove a claim of ineffective assistance of counsel." *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012).

*Application*

1.      Expert Funds

Both at trial and on appeal, Rivera argued that geolocation data from Castro's cell phone was essential to his defense because it would have supported his claim that Castro was chasing him after the fight at Club Vibe. He also argued he could not afford to retain an expert to perform a forensic analysis of Castro's cell phone. On appeal, he contends his trial counsel performed deficiently because "the trial court undoubtedly would have permitted state-funded appointment of expert assistance" if his trial counsel had filed an *Ake* motion and presented evidence of Rivera's indigency.[3]

"In *Ake*, the United States Supreme Court held that due process may require that an indigent defendant be granted access to expert assistance if 'the expert can provide assistance which is likely to be a significant factor at trial.'" *Id.* at 876 (quoting *Ake v. Oklahoma*, 470 U.S. 68, 74 (1985)). Rivera's trial counsel did not file a motion that explicitly cited *Ake* or obtain an evidentiary hearing on Rivera's indigency. However, he filed several pretrial motions asking the trial court to order the State to conduct a forensic examination of geolocation data from Rivera's and Castro's cell phones or, alternatively, to grant Rivera state funds to hire his own expert. Rivera's motions

---

[3] Rivera was represented by retained counsel at trial. He is represented by appointed counsel on appeal.

stated that his trial counsel had "determined that additional [expert] services in this case will be approximately $2,000.00" and that Rivera could not pay that amount because he was "unable to obtain gainful employment" due to his pending criminal charges. During a March 3, 2020 pretrial hearing—one of several held on this issue—Rivera's counsel stated, "He is indigent, Your Honor," and requested "a pretrial screening to show that he's indigent." The trial court refused to hear evidence on Rivera's indigency during that hearing, stating that it had already determined expert assistance was not "necessary to [Rivera's] defense." Shortly after that hearing ended, Rivera's trial counsel filed a "Statement of Inability to Afford Payment of Court Costs or an Appeal Bond," in which Rivera declared under penalty of perjury that he had no income or assets.

The record shows that after the trial court denied Rivera's requests for funds to hire an expert, Rivera's trial counsel retained "a certified cell phone examiner," William Thomas Aycock, "to give [his] expert opinion on matters relating to mobile device digital forensics, cell phone provider records, and analysis of mobile phone data." Rivera's trial counsel also filed a motion seeking to compel the State to produce "raw extraction product" from Castro's cell phone for Aycock to analyze.[4]

Rivera's trial counsel has not had an opportunity to explain why he did not explicitly cite *Ake* or make additional requests for an evidentiary hearing on Rivera's indigency. *See Goodspeed*, 187 S.W.3d at 392. On this record, Rivera has not overcome the presumption that his trial counsel's performance fell within the wide range of reasonable professional assistance. *See Bone*, 77 S.W.3d at 833; *Lopez*, 343 S.W.3d at 142–43. Accordingly, Rivera has not satisfied the first *Strickland*

---

[4] The record shows Aycock never received the data necessary to perform his analysis because neither the State nor Castro's cell phone provider had that data in their possession. While Rivera contends his trial counsel should have sent a subpoena duces tecum to Castro's cell phone provider—an argument we address below—he does not argue his counsel performed deficiently by failing to obtain the relevant data from the State.

prong on this issue. *See Strickland*, 466 U.S. at 687. We therefore need not consider the second prong of the *Strickland* analysis. TEX. R. APP. P. 47.1; *Lopez*, 343 S.W.3d at 144.

2.      Subpoena Duces Tecum

Rivera also contends his trial counsel performed deficiently by failing to serve a subpoena duces tecum on Castro's cell phone provider to obtain the relevant geolocation data. As the State notes, however, the clerk's record contains a subpoena duces tecum that Rivera's trial counsel faxed to "Verizon Legal Department" on October 20, 2020. That document requested the production of several categories of information from mobile devices associated with three phone numbers for subscribers "Hector Rivera Jr. and Lestro [sic] Castro." The requested information included, inter alia, "[l]ocation information," "any estimated or known Longitude and Latitude," and "timing and triangulation information" during the relevant time. This document appears to contradict Rivera's claim of deficient performance on this point. As a result, we cannot say that claim is "firmly founded in the record." *Bone*, 77 S.W.3d at 835; *Scheanette*, 144 S.W.3d at 510. Because Rivera has not satisfied the first *Strickland* prong on this issue, we need not consider whether he met his burden to show prejudice. TEX. R. APP. P. 47.1; *Lopez*, 343 S.W.3d at 144.

3.      Translation of Videotaped Interrogation

During the investigation into the shooting, Rivera was interrogated by Laredo police, and the State played the video of that interrogation at trial. While most of the interrogation was in English, both Rivera and the interviewing officer made several statements in Spanish. At trial, a courtroom interpreter contemporaneously translated some, but not all, of the Spanish statements while the video was playing. Both Rivera's trial counsel and the trial court disagreed with the interpreter's translation of certain words and phrases, and they made their own translations of those statements on the record and before the jury. The trial court expressly accepted trial counsel's proffered translations in front of the jury. On appeal, Rivera argues his trial counsel performed

deficiently because he did not object to this process, the interpreter's qualifications, or the trial court's failure to swear in the interpreter.

The record is silent as to why Rivera's trial counsel chose to correct the purported mistranslations as they occurred instead of objecting. Accordingly, we may not conclude his performance was deficient unless the record shows his "conduct was so outrageous that no competent attorney would have engaged in it." *Goodspeed*, 187 S.W.3d at 392. After reviewing the record, we cannot say that no reasonable trial strategy might have supported trial counsel's decision. *See, e.g.*, *Johnson*, 624 S.W.3d at 586. Accordingly, Rivera has not met his burden on the first *Strickland* prong as to this issue. *See Strickland*, 466 U.S. at 687. We therefore need not consider whether Rivera established prejudice. TEX. R. APP. P. 47.1; *Lopez*, 343 S.W.3d at 144.

We overrule Rivera's first three issues.

### *Witness's Invocation of Fifth Amendment*

In his fourth issue, Rivera argues the trial court violated his Sixth Amendment right to compulsory process by accepting witness Jesus Fernandez's invocation of his Fifth Amendment right to remain silent. He also contends the trial court erred by refusing to require Fernandez to invoke that right in front of the jury.

#### *Standard of Review and Applicable Law*

In a criminal prosecution, "the accused has the right to compulsory process for obtaining favorable witness testimony." *Safari v. State*, 961 S.W.2d 437, 442 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd, untimely filed) (citing U.S. CONST. amend. VI; TEX. CODE CRIM. PROC. ANN. art. 1.05). However, "witnesses are protected from mandatory self-incrimination under the state and federal constitutions." *Id.* (citing U.S. CONST. amend. V; TEX. CONST. art. I, § 10). In circumstances where these rights conflict, a defendant's right to compel testimony does not

override a witness's legitimate fear of possible incrimination. *See Walters v. State*, 359 S.W.3d 212, 215–16 (Tex. Crim. App. 2011).

Nevertheless, a trial court may not "simply take the word of potential witnesses who claim to fear prosecution." *Id.* at 215 (citing *Ohio v. Reiner*, 532 U.S. 17, 21 (2001) (per curiam)). When a witness invokes his right against self-incrimination, the trial court must "make an inquiry into the reasonableness of" that invocation. *Id.* at 216. Because the Fifth Amendment's protections apply not only to statements that would support a conviction, but also to those that would "furnish a link in the chain of evidence needed to prosecute," the trial court should consider whether it is "evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Id.* at 215 (internal quotation marks omitted). In making this determination, a trial court "must be governed as much by [its] personal perception of the peculiarities of the case as by the facts actually in evidence." *Hoffman v. United States*, 341 U.S. 479, 487 (1951) (internal quotation marks omitted).

*Application*

Before Rivera called Fernandez to the stand, the trial court informed the parties that Fernandez had told court staff he "[did] not want to testify and [did] not want to incriminate himself in any way. . . . He is just going to come in here and say that he has a right not to incriminate himself." At that point, Fernandez was not represented by counsel, so the trial court appointed an attorney to represent him. After Fernandez consulted with the appointed attorney, the trial court permitted Rivera to make a bill of exception in the court's presence regarding the testimony he would have sought from Fernandez. When Fernandez took the stand for the bill of exception, he invoked the Fifth Amendment in response to each substantive question he was asked.

Rivera contends "the trial court was obligated to make a further determination of whether [Fernandez's] assertion of privilege was valid" because Fernandez indicated his intent to invoke the Fifth Amendment before he "knew what he was going to be asked, and before he even spoke to an attorney[.]" While we agree the trial court was required to consider whether Fernandez had a legitimate fear of possible incrimination, we do not believe the record shows it failed to do so here. The substantive questions Rivera asked Fernandez during the bill of exception went to whether Fernandez assaulted Rivera at Club Vibe before the shooting, "set up an ambush" for Rivera on the night of the shooting, or "directed [his] friends to assault" Rivera after Martinez's funeral. The trial court could have reasonably determined that answers to these questions might incriminate Fernandez. *See Reiner*, 532 U.S. at 21–22; *Walters*, 359 S.W.3d at 215. Accordingly, Rivera has not shown the trial court erred by accepting Fernandez's invocation of the Fifth Amendment. *See Walters*, 359 S.W.3d at 216–17.

Rivera also argues the trial court erred by denying his request to allow the jury to hear Fernandez invoke the Fifth Amendment. This court has previously held, however, that "[a] defendant does not have the right to have a witness invoke the Fifth Amendment privilege in the presence of the jury." *Suarez v. State*, 31 S.W.3d 323, 329 (Tex. App.—San Antonio 2000, no pet.).

We overrule Rivera's fourth issue.

### *Jury Charge Error*

In his fifth issue, Rivera argues the trial court erred by refusing "to narrow the specific modes of party-liability conduct in the application paragraph of the jury charge[.]"

#### *Standard of Review and Applicable Law*

We review claims of jury charge error under a two-pronged test. *See, e.g.*, *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005). We "must first determine whether the complained-

of error exists." *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013). If we conclude the charge is erroneous, we then consider "whether the error harmed the appellant." *Id.*; *Hernandez v. State*, 585 S.W.3d 537, 554 (Tex. App.—San Antonio 2019, pet. ref'd).

The application paragraphs of a jury charge apply "the pertinent penal law, abstract definitions, and general legal principles to the particular facts and the indictment allegations" to specify "the factual circumstances under which the jury should convict or acquit[.]" *Vasquez v. State*, 389 S.W.3d 361, 366–67 (Tex. Crim. App. 2012). If the State alleges a defendant is criminally responsible for the conduct of another, the defendant may ask the trial court to narrow the application paragraphs to "refer *only* to those specific party-liability acts that are supported by the evidence[.]" *Id.* at 368. If the defendant makes such a request, the trial court must grant it. *Id.* However, "a general reference to the law of parties in the application paragraph is sufficient and is not error when the defendant does not object and request a narrowing of the specific statutory modes of conduct that constitute party liability—whether he 'solicited, encouraged, directed, aided or attempted to aid' another specified person to commit the offense." *Id.* (quoting TEX. PENAL CODE ANN. § 7.02, footnotes omitted).

*Application*

Here, the charge's application paragraphs asked the jury to determine whether "Rivera, acting alone or as a party (acting with intent to promote or assist the commission of the offense, solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense)" committed murder or aggravated assault "as charged in the indictment." The party-liability acts listed in the application paragraphs tracked the applicable statutory language. *See* TEX. PENAL CODE § 7.02(a)(2); *see also Vasquez*, 389 S.W.3d at 368.

Rivera did not ask the trial court to remove any of the statutory party-liability acts listed in the application paragraphs. Instead, he asked the trial court to add language derived from case law

to instruct the jury that "any agreement to accomplish a common purpose must have been before or contemporaneously with the criminal event." As support for this request, Rivera relied on *Cordova v. State*, which held that "[e]vidence is sufficient to convict the defendant under the law of parties where he is physically present at the commission of the offense, and encourages the commission of the offense either by words or other agreement." 698 S.W.2d 107, 111 (Tex. Crim. App. 1985).

An explicit agreement to commit an offense is not one of the specific statutory modes of conduct that constitute party liability. *See* TEX. PENAL CODE § 7.02(a)(2); *Vasquez*, 389 S.W.3d at 368. Accordingly, we decline to hold that Rivera's requested language regarding the timing of such an agreement, if any, constituted a narrowing of those modes. *See* TEX. PENAL CODE § 7.02(a)(2); *see also Parfait v. State*, 120 S.W.3d 348, 350 (Tex. Crim. App. 2003) (courts may not add to or subtract from an unambiguous statute). Moreover, while *Cordova* held evidence of an agreement was sufficient to support conviction on a party-liability theory in that case, it did not hold that a defendant is entitled to a jury instruction regarding any such agreement. *See generally Cordova*, 698 S.W.2d at 111. "[G]enerally speaking, neither the defendant nor the State is entitled to a special jury instruction relating to a statutory offense or defense if that instruction (1) is not grounded in the Penal Code, (2) is covered by the general charge to the jury, and (3) focuses the jury's attention on a specific type of evidence that may support an element of an offense or a defense." *Walters v. State*, 247 S.W.3d 204, 212 (Tex. Crim. App. 2007); *see also Kirsch v. State*, 357 S.W.3d 645, 651 (Tex. Crim. App. 2012) (noting that a "facially neutral and legally accurate" instruction "may nevertheless constitute an improper comment on the weight of the evidence"). Rivera cites no authority holding that a trial court erred by refusing to add the language he requested to a party-liability application paragraph, and we have found none. For these reasons,

Rivera has not shown the trial court erred by refusing to add his requested language to the jury charge.

We overrule Rivera's fifth issue.

## CONCLUSION

We affirm the judgment.

Beth Watkins, Justice

DO NOT PUBLISH