

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00505-CR

Jorge **IZQUIERDO**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 175th Judicial District Court, Bexar County, Texas
Trial Court No. 2020CR10739
Honorable Catherine Torres-Stahl, Judge Presiding

Opinion by:  Luz Elena D. Chapa, Justice

Sitting:  Patricia O. Alvarez, Justice
Luz Elena D. Chapa, Justice
Irene Rios, Justice

Delivered and Filed: May 22, 2024

AFFIRMED

Appellant Jorge Izquierdo challenges his judgment of conviction for murder. He argues the

trial court erred by (1) denying his motion for continuance and (2) admitting a doorbell video

recording into evidence. We affirm.

### BACKGROUND

On August 19, 2020, Cora Nickel, Izquierdo, and their two daughters returned to Nickel's

house after a birthday party. At the time, Izquierdo was not living with the family. Nickel and

Izquierdo were arguing as they entered her house. The following morning, the children found their

mother lifeless on the floor with a gunshot wound to the head. A grand jury indicted Izquierdo for the murder of Nickel on November 3, 2020. *See* TEX. PENAL CODE § 19.02. On August 4, 2022, a jury found Izquierdo guilty and sentenced him to fifty years' confinement with the Texas Department of Criminal Justice Correctional Institutions Division.

This appeal followed.

### MOTION FOR CONTINUANCE

Izquierdo argues the trial court abused its discretion by denying his motion for continuance, and the trial court's ruling deprived him of expert assistance.

### A. Law and Standard of Review

Texas Code of Criminal Procedure article 29.03 provides a trial "may be continued on the written motion of the State or of the defendant, upon sufficient cause shown; which cause shall be fully set forth in the motion." TEX. CODE CRIM. PROC. art. 29.03. If a defendant's first continuance motion is "on account of the absence of a witness," the defendant must: (1) provide the witness's name and residence (if residence is known), (2) identify the diligence used to procure the witness's attendance, (3) identify the facts "expected to be proved by the witness," which "must appear" to the trial court to be material, (4) state the defendant did not procure or consent to the witness's absence, (5) state the motion is not made to delay, and (6) provide:

> [t]hat there is no reasonable expectation that attendance of the witness can be secured during the present term of court by a postponement of the trial to some future day of said term. The truth of the first, or any subsequent motion, as well as the merit of the ground set forth therein and its sufficiency shall be addressed to the sound discretion of the court called to pass upon the same, and shall not be granted as a matter of right.

*Id.* art. 29.06. Article 29.07 provides a defendant making subsequent motions is required to state, in addition to article 29.06's requirements, he: (1) cannot procure the testimony from any other source known to him and (2) "has reasonable expectation of procuring the same at the next term

of the court." *Id.* art. 29.07. In addition, "[a]ll" continuance motions "must be sworn to by a person having personal knowledge of the facts relied on for the continuance." *Id.* art. 29.08. There is no "statutory provision that governs a pretrial motion for continuance for the purpose of securing expert assistance. But that just means that the resolution of such a motion is '*particularly* within the discretion of the trial court.'" *Gonzales v. State*, 304 S.W.3d 838, 843–44 (Tex. Crim. App. 2010) (quoting George E. Dix & Robert O. Dawson, 42 *Texas Practice: Criminal Practice and Procedure* § 28.56 (2d ed. 2001)).

"We review a trial court's ruling on a motion for continuance during trial for an abuse of discretion." *Kinnett v. State*, 623 S.W.3d 876, 906 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd). A trial court abuses its discretion (1) if it erred in denying a motion for continuance and (2) "if the record shows with considerable specificity how the defendant was harmed by the absence of more preparation time than he actually had." *Gonzales*, 304 S.W.3d at 842–43; *see also De Vaughn v. State*, 239 S.W.3d 351, 355 (Tex. App.—San Antonio 2007, pet. ref'd) ("In order to establish an abuse of the trial court's discretion, an appellant must show that the denial of his motion for continuance resulted in actual prejudice.").

Demonstrating the trial court erred "most likely requires a showing that the case made for delay was so convincing that no reasonable trial judge could conclude that scheduling and other considerations as well as fairness to the State outweighed the defendant's interest in delay of the trial." *Gonzales*, 304 S.W.3d at 843 (quoting Dix & Dawson at 533). A showing, with considerable specificity, how the defendant was harmed is usually "made only at a hearing on a motion for new trial, because almost always only at that time will the defendant be able to produce evidence as to what additional information, evidence or witnesses the defense would have had available if the motion for delay had been granted." *Id.* at 842–43 (quoting Dix & Dawson at 532–33). "Speculation will not suffice to obtain reversal for a trial court's failure to grant a continuance."

*Kinnett*, 623 S.W.3d at 906 (quoting *Nwosoucha v. State*, 325 S.W.3d 816, 825 (Tex. App.—

Houston [14th Dist.] 2010, pet. ref'd)) (internal quotation marks omitted). And "[a] trial court does

not abuse its discretion as long as its decision is within the zone of reasonable disagreement."

*Brumfield v. State*, 641 S.W.3d 568, 580 (Tex. App.—Tyler 2022, pet. ref'd).

### B. Analysis

Izquierdo moved for a continuance on July 26, 2022—his second continuance motion.[1]

Defense counsel explained the motion was not filed to delay trial, and further explained:

> 3) Defendant's counsel is requesting a continuance until [a]fter September 30, 2022
> [o]f newly tendered evidence and a newly noticed expert witness by the State of
> Texas.
>
>> a) On July 25, 2022 at 5:45 pm, defense received an email tendering a
>> forensic discovery package. The link included a 373 page report from an
>> expert witness with DNA evidence.
>>
>> b) The forensic discovery package and Blu-Ray disc provided to defense
>> counsel on July 18, 2022 also contained files that defense counsel could not
>> open. Defense made the State aware of the files that could not be opened on
>> July 26, 2022.
>>
>> c) On July 25, 2022 at 9:50 pm, defense counsel received an email from the
>> state giving notice of an expert witness not previously included on the
>> State's list of witnesses. Defense will need an expert of their own to counter
>> this witness at trial.
>
> 4) Defense counsel must request this continuance to properly prepare for trial and
> to provide effective assistance of counsel . . . .

At the July 27, 2022 hearing, Izquierdo reiterated the reasons identified in the motion and further

argued the defense had "in the past two days, located an expert" to use, but the defense had "not

yet filed a motion." The expert motion "would have been sealed and ex parte, but I need to do it

here on the record to tell the Court what we intend to do, to have our own firearms and ballistics

---

[1] The second continuance motion is entitled "Defendants 3rd Motion for Continuance," but the record does not include any motion for continuance between the second and first motion filed July 15, 2022. The first continuance motion was denied on July 22, 2022.

expert to counter the expert that the State intends to use at trial." However, Izquierdo did not identify the expert or make a motion for a defense expert.[2]

Also during the hearing, the State indicated the discovery it produced was "already . . . tendered to defense," and contained "pictures of [the experts'] genome mapping and their internal memos to each other." The State explained the evidence showed "the only DNA there was, was blood from our victim," not from the defendant. And there was also DNA evidence of "an unknown male . . . found on a beer can in the garage." But the State conceded it erred in providing late notice by leaving gun expert Holli Worden off its witness list.[3] The State noted it provided the "the Bexar County Criminal Investigation Laboratory results firearms report" by Worden to the defense in February 2021, and no gun was recovered from the scene. The State argued this disclosure was therefore "not new information," and further argued if the trial court were inclined to grant the continuance, the State preferred the trial court exclude the DNA evidence and gun expert altogether.[4] Izquierdo explained that even though he was aware of Worden's report since February 2021, he did not know the State would call her to testify, and his defense expert would not have his counter report ready before September 30.

That same day, the trial court denied the motion based on the State's proposal to withdraw the expert instead of granting the continuance: "[t]he State has represented to this court that it does not intend to present such expert as a witness in this trial. Based on that representation by the State, this court finds that there is no sufficient cause for a continuance, and trial is set to begin on August 1, 2022."

---

[2] The record does not show any motion seeking a defense expert having been filed after the continuance hearing either.

[3] However, the State's concession of failing to provide notice of the expert was erroneous because the State disclosed the expert on its witness list more than one year earlier in June 2021.

[4] The State also argued against the continuance because it had already booked flights for its other witnesses traveling from out of state.

Here, the State's proposal addressed the basis of Izquierdo's motion, causing the trial court to deny the motion. Furthermore, in support of his motion, Izquierdo did not provide the expert witness's name or residence, identify the diligence used to procure the witness's attendance, did not explain whether he procured or consented to the witness's absence, and did not provide whether he procured the testimony from any other source known to him. *See* TEX. CODE CRIM. PROC. arts. 29.06, 29.07. We therefore cannot conclude Izquierdo established his case for a continuance was so convincing that no reasonable trial court could conclude that scheduling and other considerations, such as fairness to the State, outweighed the defendant's interest in the trial's delay. *See Gonzales*, 304 S.W.3d at 843.

Even assuming the trial court erred in denying the motion, the record does not show with considerable specificity how Izquierdo was harmed by the absence of more expert preparation time. *See id.* at 842–44; *see De Vaughn*, 239 S.W.3d at 355. Such a showing is usually made only at a hearing for a motion for a new trial "because almost always only at that time will the defendant be able to produce evidence as to what additional information, evidence or witnesses the defense would have had available if the motion for delay had been granted." *Gonzales*, 304 S.W.3d at 843. But Izquierdo did not move for a new trial.

Instead, he argues despite the State's proposal, Worden testified on the State's behalf; therefore, the trial court's denial of his continuance motion negatively impacted his ability to present an effective defense because he was unable to contravene or more thoroughly cross-examine Worden and other State experts. During trial, the State informed the trial court Worden "was, in fact, on our witness list a year and a half ago. So it's the State's intention if the Court would reconsider the ruling on that motion to call that witness." Izquierdo's counsel agreed Worden had been identified on the witness list, and the trial court reconsidered and ruled Worden was permitted to testify. *See* TEX. R. APP. P. 33.1.

He otherwise fails to show with considerable specificity how he was harmed by the trial court denying him additional time to prepare for Worden's testimony. *See Gonzales*, 304 S.W.3d at 842–44; *Kinnett*, 623 S.W.3d at 906; *De Vaughn*, 239 S.W.3d at 355. As the record shows, Worden was on the State's witness list, which it had provided to the defense more than a year before the continuance motion was filed, and Izquierdo also had Worden's report for more than a year before filing the motion for continuance. Izquierdo therefore had ample time to move for a court-appointed expert to counter Worden's expert opinion. Moreover, Izquierdo does not otherwise identify with specificity what additional information, evidence or witnesses the defense would have had available if the motion for continuance had been granted. *See Gonzales*, 304 S.W.3d at 843.

Izquierdo further argues his motion should have been granted so he could "explore" the unidentified male DNA evidence; but, Izquierdo never specifically mentioned the unidentified male DNA in his motion or at the hearing for that purpose. During the continuance hearing, Izquierdo explained: "I don't think the DNA evidence is the make or break evidence in this case. My issue is now that I know the State intend[s] to call a firearms expert, I need an expert on my side, too." Izquierdo also did not identify with any specificity how he was harmed by the absence of more preparation time with the male DNA evidence. For example, he did not show what additional information, evidence or witnesses the defense would have had available if the trial court had granted his continuance motion. *See id*.

Because we cannot conclude the trial court erred by denying the motion for continuance and because Izquierdo has failed to show with considerable specificity how he was harmed by the absence of additional preparation time, we conclude the trial court did not abuse its discretion by denying the motion. *See Gonzales*, 304 S.W.3d at 844.

### C. Deprivation of Expert Assistance

Izquierdo further contends that because he offered no expert in opposition to the State's expert and requested a mere "relatively short continuance," the trial court's continuance order "amounted to a total deprivation of expert assistance," citing *Ake v. Oklahoma*, 470 U.S. 68 (1985).

In *Ake*, "[t]he [U.S.] Supreme Court [] recognized that an indigent defendant has a constitutional right to a court-appointed expert in some circumstances." *Ehrke v. State*, 459 S.W.3d 606, 614 (Tex. Crim. App. 2015) (citing *Ake*, 470 U.S. at 74–77), *abrogated on other grounds in Watkins v. State*, 619 S.W.3d 265, 288 (Tex. Crim. App. 2021). *See generally Ake*, 470 U.S. at 77 ("Three factors are relevant to this determination. The first is the private interest that will be affected by the action of the State. The second is the governmental interest that will be affected if the safeguard is to be provided. The third is the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided."); *Ex parte Jimenez*, 364 S.W.3d 866, 876 (Tex. Crim. App. 2012) ("This analysis is conducted with a view towards whether failing to provide the defendant with the expert help he claims is necessary creates 'a high risk of an inaccurate verdict.'" (quoting *Busby v. State*, 990 S.W.2d 263, 271 (Tex. Crim. App. 1999) (per curiam))). "Under *Ake*, for meaningful access to justice, a defendant must have 'access to the raw materials integral to the building of an effective defense.'" *Ehrke*, 459 S.W.3d at 615 (quoting *Ake*, 470 U.S. at 77). "While the appointment of an expert may be required in some circumstances, the state does not need to 'purchase for the indigent defendant all the assistance that his wealthier counterpart might buy.'" *Id.* (quoting *Ake*, 470 U.S. at 77); *see Jimenez*, 364 S.W.3d at 876-77.

The defendant has the burden to "provide concrete reasons for requiring the appointment of any particular expert." *Jimenez*, 364 S.W.3d at 878. "The question in each case is 'how important the scientific issue is in the case, and how much help a defense expert could have

given. . . . The nature of an expert's field and the importance and complexity of the issue will bear directly upon whether the appointment of an expert will be helpful." *Id.* at 877 (quoting *Rey v. State*, 897 S.W.2d 333, 338 (Tex. Crim. App. 1995)). A defendant typically makes a preliminary showing of a significant fact issue "based upon more 'than undeveloped assertions that the requested assistance would be beneficial.'" *Id.* at 881 (quoting *Williams v. State*, 958 S.W.2d 186, 192 (Tex. Crim. App. 1997)). "Courts uniformly stress that the showing of need must set forth in detail what assistance is being requested and why it is needed. The defense must identify the expert, explain what the expert will do, and explain why that will be important in representing the defendant." *Id.* at 878 (quoting 3 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 11.2(e) at 654 (3d ed. 2007)). A sufficient showing is not made if a defendant "has failed to support his motion with affidavits or other evidence in support of his defensive theory, an explanation as to what his defensive theory was and why expert assistance would be helpful in establishing that theory, or a showing that there was a reason to question the State's expert and proof." *Ehrke*, 459 S.W.3d at 615–16 (concluding appellant "failed to make a preliminary showing of significant issue of fact-it provided no concrete reasoning" as to why an expert was needed); *see, e.g.*, *Jimenez*, 364 S.W.3d at 878 ("Thus, courts have held that a trial judge does not err in denying funds for an appointed expert if the defense fails to set out the name of the requested expert in his motion, why the expert is necessary in the particular case, and the approximate cost of appointing that expert.").

Here, Izquierdo retained his own trial counsel, and nothing in the record shows he was indigent at the time of trial.[5] *See Jimenez*, 364 S.W.3d at 876–77. Furthermore, Izquierdo did not file a motion for a court-appointed expert before, during, or after the continuance hearing, and his

---

[5] After Izquierdo's trial, his retained counsel filed a motion to withdraw, arguing Izquierdo was indigent and could not afford counsel.

counsel did not mention a need to retain an expert or needing assistance to do so, other than vaguely stating he had identified one and a continuance would give the expert time to prepare. Because the record is devoid of any showing Izquierdo was either indigent or ever moved the trial court to appoint a defense expert, we cannot conclude the trial court's actions in denying his continuance deprived Izquierdo of expert assistance. *See* TEX. R. APP. P. 33.1; *Jimenez*, 364 S.W.3d at 882 ("But we cannot review the merits of an *Ake* claim on either direct appeal or habeas review if the defendant failed to file a proper pretrial *Ake* motion that the trial judge denied. In this case, applicant forfeited consideration of her *Ake* claim on habeas review because she failed to preserve her constitutional claim in the trial court by filing a proper written *Ake* motion and ensuring that the trial judge formally ruled on it."); *Sitawisha v. State*, 496 S.W.3d 826, 830 (Tex. App.— Houston [1st Dist.] 2016, pet. ref'd) ("The *Ake* 'right' arises only upon a valid request for assistance, and it similarly imposes no requirement that a trial court advise a self-represented defendant about the possibility of assistance." (quoting *Ehrke*, 459 S.W.3d at 617)).

Accordingly, we cannot conclude the trial court abused its discretion in denying Izquierdo's continuance or otherwise denied him expert assistance.[6]

### ADMISSION OF EVIDENCE

Izquierdo argues the trial court abused its discretion in admitting a doorbell video recording over his objection. Specifically, he contends the evidence was not relevant and was prejudicial.

---

[6] Izquierdo also argues the trial court's error amounted to structural error. Finding no error, we need not consider this argument. Even if we had found error, "Texas courts only treat error as structural if the United States Supreme Court has labeled it as such." *Cordova-Lopez v. State*, 680 S.W.3d 5, 9 (Tex. App.—Houston [1st Dist.]2022, pet. ref'd) (citing *Lake v. State*, 532 S.W.3d 408, 411 (Tex. Crim. App. 2017)). The denial of an expert is subject to the harmless error analysis appropriate for constitutional errors. *Lighteard v. State*, 982 S.W.2d 532, 535 (Tex. App.—San Antonio 1998, pet. ref'd); *Cuadros-Fernandez v. State*, 316 S.W.3d 645, 664 (Tex. App.—Dallas 2009, no pet.) (exclusion of expert subject to harm analysis); *see also Jimenez*, 364 S.W.3d at 882 (concluding court could not "review the merits of an *Ake* claim" because "the defendant failed to file a proper pretrial *Ake* motion that the trial judge denied"); *Cordova-Lopez*, 680 S.W.3d at 11 ("He does not cite to any authority to support that his arguments related to facial coverings are structural error." (citing *Lake v. State*, 532 S.W.3d 408, 411 (Tex. Crim. App. 2017)).

## A. Standard of Review and Law

"We review the trial court's decision to admit evidence for abuse of discretion." *Brumfield*, 641 S.W.3d at 576; *see Pugh v. State*, 639 S.W.3d 72, 90–91 (Tex. Crim. App. 2022). "As long as the trial court's ruling was at least within the zone of reasonable disagreement, the appellate court will not intercede." *Brumfield*, 641 S.W.3d at 576. "Furthermore, if the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it will not be disturbed, even if the trial judge gave the wrong reason for a correct ruling." *Id.*

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401. "Evidence does not need to prove or disprove a particular fact by itself to be relevant under this rule; it is sufficient if the evidence provides even a small nudge toward proving or disproving a fact of consequence." *Hall v. State*, 663 S.W.3d 15, 31 (Tex. Crim. App. 2021). "But, if the evidence fails to meet this threshold standard, it is inadmissible." *Id.*; *see* TEX. R. EVID. 402 ("Irrelevant evidence is not admissible.").

"The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. "'Almost all evidence offered by the prosecution will be prejudicial to the defendant. Only evidence that is *unfairly* prejudicial should be excluded.'" *Inthalangsy v. State*, 634 S.W.3d 749, 758 (Tex. Crim. App. 2021) (quoting *DeLeon v. State*, 77 S.W.3d 300, 315 (Tex. App.—Austin 2001, pet. ref'd)). "Unfair prejudice refers to the evidence's 'tendency to tempt the jury into finding guilt on grounds apart from proof of the offense charged.'" *Perkins v. State*, 664 S.W.3d 209, 216 (Tex. Crim. App. 2022) (quoting *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005)). In analyzing visual evidence's inflammatory nature, we consider, "among other things, the evidence's

gruesomeness, level of detail, and perspective. In looking at these factors, a court can consider whether the visual evidence tends to improperly inflame the passions of the jury and cause them to resolve the case on an improper basis." *Pugh*, 639 S.W.3d at 87 (footnote omitted); *see Sonnier v. State*, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995) ("Several factors may be considered in determining whether the danger of unfair prejudice substantially outweighs the probative value of photographs including 'the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, whether the body is naked or clothed [, and] . . . the availability of other means of proof and the circumstances unique to each individual case.'" (quoting *Emery v. State*, 881 S.W.2d 702, 710 (Tex. Crim. App. 1994))).

A Rule 403 analysis should generally "include, but is not limited to, a balancing of the following factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence." *Pugh*, 639 S.W.3d at 86; *see also Hall*, 663 S.W.3d at 32 ("When undertaking a Rule 403 analysis, a trial court must balance: '(1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.'" (quoting *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006))).

We may only reverse the trial court's judgment "rarely and only after a clear abuse of discretion." *Perkins*, 664 S.W.3d at 217 (quoting *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999)) (internal quotation marks omitted). "The reviewing court, however, cannot simply

conclude 'the trial court did in fact conduct the requir[ed] balancing test and did not rule arbitrarily and capriciously.'" *Id.* (quoting *Mozon*, 991 S.W.2d at 847) (internal quotation marks omitted). We must "measure the trial court's ruling against the relevant criteria by which a Rule 403 decision is made." *Id.*

### B. Analysis

#### 1. The Probative Value

Izquierdo argues the doorbell video recording was not probative of culpability, did not rebut a defensive theory, and did not aid in the evaluation of any particular witness's credibility. The State argues the video was relevant to establish identity because it shows Izquierdo had entered the house and only the children exited through the front door.

Turning to the evidence, the trial court heard testimony from A.N.R., the oldest daughter, who testified her mom and Izquierdo began to argue around 10 p.m. on August 19 when returning from a party. After entering the house, her mom told Izquierdo to leave. He refused, insisting on doing laundry. At that point, her mom put her and her sister to sleep in her bedroom. A.N.R. further testified she then heard the front door open, close, and then open again; she did not know whether Izquierdo had opened and closed the front door. She testified she went downstairs at 4 a.m., saw her mom lying on the floor in the dark, and then turned around and went back upstairs. The morning after, she woke up at 7 a.m. and began watching tv. She testified when C.N.R. woke up, she told her she thought their mom was dead, and they cried. C.N.R then went downstairs and looked at their mom's body. She returned upstairs and told A.N.R. "Mom's gone, which [means] dead." A.N.R. testified she used her mom's phone to call Lynette Robison—her maternal grandmother—and Robison went to the house.

C.N.R. largely testified to the same details as A.N.R. However, C.N.R. also testified she did not know for certain whether Izquierdo or anyone else was in the house at the time she saw her

mom's body, but she did not see anyone in the house. She also testified she did not know whether A.N.R. saw anyone else in the house. Robison similarly testified, adding that when she arrived, she saw Izquierdo's car in the driveway, and she was uncertain what was happening inside the house. She went inside, saw her daughter lifeless, and called 911. Testimony revealed the call took place at approximately 10:03 a.m., with officers arriving on the scene at approximately 10:09 a.m.

The daughters' testimony was reflected in the body camera footage of Officer Christopher de los Santos of the San Antonio Police Department (SAPD). The body cam footage shows Officer de los Santos speaking with the daughters at approximately 10:12 a.m. on August 20. C.N.R. is heard stating Izquierdo "is not in our house and his car is still here." A.N.R. is seen visibly upset during the conversation and is heard saying "we don't know where [Izquierdo] is, he could end up being in the garage, I don't know; he is not in our room or my mom's."

Nicholas Meyers, a neighbor from across the street, testified he had an installed home surveillance camera over his garage, and it captured video of when Izquierdo, Nickel, and the children arrived to the house on the night of August 19. He further testified it did not capture any vehicles departing or returning to the house after they had arrived.

Detective Kevin Schmachtenberger of SAPD's Digital Forensics Unit testified he collected video footage from a Ring doorbell camera located at Nickel's front door for the dates of August 19 and August 20, 2020. During trial, the detective authenticated State Exhibit 13—which is a CD recording of the doorbell footage. Detective Schmachtenberger then testified that between 10 p.m. August 19, 2020 and the following morning of August 20, no one is seen exiting the house using the front door, other than the children the following morning.

Izquierdo objected to the admission of Exhibit 13 as "highly prejudicial. We already heard from the children, [the jury has] already heard how distraught the children were. It's just the children crying, leaving. This is cumulative. The jury does not need to see more distraught

children. It's way more prejudicial than probative." The State responded by arguing the footage in question "shows that nobody came out of the house except the children. . . . So I think it shows exactly what we're trying to prove, that the defendant did not come out the front door. Nobody but those children ever came out the front door." The trial court overruled the objection and admitted the exhibit.

The doorbell footage includes clips showing Izquierdo, Nickel, and the children entering the house at approximately 10:22 p.m. on August 19; it also includes a clip date and time-stamped August 20 at 10:02 a.m. that begins with the sound of a high-pitched cry from off-camera, followed by C.N.R. and A.N.R. appearing as they exited the house. C.N.R. appears first, and she is holding a small stuffed animal and a small purse, and is facing in the direction of the doorbell's camera. She is crying. A.N.R. then appears with a serious expression, while holding a stuffed animal and putting on a backpack. C.N.R. turns her face away from the doorbell camera, fans her face with her hands, and then turns her face in the direction of the doorbell camera again. She and A.N.R. then briefly embrace, and C.N.R. stops crying.

After Exhibit 13 was admitted, Detective Schmachtenberger continued his testimony, recalling the exhibit showed that after Izquierdo, Nickel, and the children entered the house at approximately 10:22 p.m., no one was seen entering or leaving through the front door until the next morning when the children are seen exiting. The State then asked, "And what do the two girls do when they exited?" Detective Schmachtenberger responded, "They were crying and I think they hug each other if I remember."

Officer Sean King testified he was dispatched to the scene at 10 a.m. His police report lists the date and time as 10:09 a.m. on August 20.[7] At the time of his arrival, he entered the house and

---

[7] Officer King indicated another officer arrived approximately one to two minutes before him.

conducted a protective sweep and found no one else in the house. Officer King testified he communicated with one of the decedent's neighbors who shared a back fence line; the neighbor informed Officer King he had heard some type of disturbance late the previous night. Officer King testified he then noticed fresh damage to the fence. Officer King also testified he found a set of keys along the fence line that were later identified as Izquierdo's keys to the vehicle parked in the driveway.

Shay Pollin testified she lived one street over from Maverick Draw on a cul-de-sac adjacent to a ditch area. She testified she "had seen a man running at night and he was in like regular clothes, not running clothes. And it was around 10:30 or 11:00 that we had seen the man running past the house . . . like he was running from something." She stated he ran past them and "ran into the ditch" and then went up an incline on the other side of the ditch where it met another street.

When reviewing the evidence and remaining mindful it "does not need to prove or disprove a particular fact by itself to be relevant under this rule," the evidence shows the State, after identifying Izquierdo as entering the house, sought to demonstrate Izquierdo committed the murder and after doing so, exited the house through the back door. *See Hall*, 663 S.W.3d at 30–31. The doorbell footage shows Izquierdo entered the house the night of August 19, and no footage exists showing he exited the house through the front door walking toward his vehicle in the driveway. Along with the neighbor's surveillance footage, Izquierdo's keys found in the backyard, the broken fence, Izquierdo's car left parked in the driveway, the testimony discussing Izquierdo's unknown whereabouts, and the sighting of an individual running through the neighborhood, the doorbell footage has probative value as circumstantial evidence of Izquierdo's back door exit after Nickel's murder. *See* TEX. R. EVID. 401; *Salazar v. State*, 90 S.W.3d 330, 336–39 (Tex. Crim. App. 2002) ("In close cases, courts should favor the admission of relevant evidence."). We therefore cannot

conclude the doorbell footage has no probative value. This factor weighs slightly in favor of admission.

### 2. The Potential to Impress the Jury in Some Irrational, Yet Indelible Way

Appellant contends the evidence only served to inflame the jury. The State counters the fact the evidence may arouse some passion from the jury does not overcome the presumption relevant evidence is more probative than prejudicial.

Assuming the doorbell footage showing the children exiting the house and C.N.R. emotional is prejudicial, "[o]nly evidence that is *unfairly* prejudicial should be excluded.'" *See Pugh*, 639 S.W.3d at 93; *Inthalangsy*, 634 S.W.3d at 758 (quoting *DeLeon*, 77 S.W.3d at 315). The footage of the children is not visibly gruesome.[8] *See Pugh*, 639 S.W.3d at 93. The evidence is also not especially detailed; it is a brief, twenty-second clip of the children exiting the house. *See id* at 95 ("Moreover, the exhibits themselves each only last a matter of seconds."). No other similar footage is offered by the State. There is also no other evidence demonstrating the only persons recorded by the doorbell camera exiting the front door between the night of August 19 and the following morning were the children. *See Pugh*, 639 S.W.3d at 87; *Sonnier*, 913 S.W.2d at 518. The evidence also relates to a discrete issue: the State's theory suggesting Izquierdo left the house through a back door after committing the murder. It therefore likely has no potential to result in the jury confusing any other evidence more directly tied to the crime's commission like the weapon involved in the crime, bullet fragments, the firearms report, the positioning of the decedent's body, and the decedent's fatal head wound. This factor weighs in favor of admission.

---

[8] This is in contrast to the number of gruesome videos and photographs of decedent's body lying in a pool of blood that were admitted into evidence.

### 3. The Time Needed to Develop the Evidence

The State did not spend much time on the twenty-second footage. *See Pugh*, 639 S.W.3d at 95. Only three of the twenty-two witnesses over the course of two days of testimony mentioned details of the doorbell footage, and only two discussed the girls exiting the house crying. *See Inthalangsy*, 634 S.W.3d at 759. Twice during the State's closing—consisting of twenty-three pages of transcript—the State raised the doorbell footage, but the State did not raise the fact C.N.R. is crying. Accordingly, this factor weighs in favor of admission.

### 4. The State's Need for the Evidence

Finally, the State's need for the evidence was low. On the one hand, the doorbell footage tends to demonstrate that after Izquierdo, Nickel, and the children entered the house the night before, no one exited the house until the children exited the following morning. However, the State presented evidence showing Izquierdo's vehicle never left the driveway, Izquierdo's keys were found in the backyard, there was fresh damage to the back fence line, and at least one neighbor saw a man running away from the house. Officers also testified as to their time of arrival on the scene and their sweeping of the house for potential threats, minutes after the girls exited the house. This factor weighs against admission.

Because the trial court's admission of the doorbell footage under Rule 403 is within the zone of reasonable disagreement and we cannot conclude the trial court erred by finding the probative value of the evidence was substantially outweighed by the risk of unfair prejudice, we cannot conclude the trial court abused its discretion by admitting the evidence.

### CONCLUSION

The judgment is affirmed.

Luz Elena D. Chapa, Justice

DO NOT PUBLISH